# STENBERG, ATTORNEY GENERAL OF NEBRASKA, ET AL. *v.* CARHART

No. 99–830.  Argued April 25, 2000—Decided June 28, 2000

918

BREYER, J., delivered the opinion of the Court, in which STEVENS, O'CONNOR, SOUTER, and GINSBURG, JJ., joined. STEVENS, J., filed a concurring opinion, in which GINSBURG, J., joined, *post*, p. 946. O'CONNOR, J., filed a concurring opinion, *post*, p. 947. GINSBURG, J., filed a concurring

opinion, in which STEVENS, J., joined, *post*, p. 951. REHNQUIST, C. J., *post*, p. 952, and SCALIA, J., *post*, p. 953, filed dissenting opinions. KENNEDY, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 956. THOMAS, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA, J., joined, *post*, p. 980.

*Don Stenberg*, Attorney General of Nebraska, *pro se*, argued the cause for petitioners. With him on the briefs was *L. Steven Grasz*, Deputy Attorney General.

*Simon Heller* argued the cause for respondent. With him on the brief were *Janet Benshoof, Priscilla J. Smith, Bonnie Scott Jones, Jerry M. Hug*, and *Alan G. Stoler.**

---

*Briefs of *amici curiae* urging reversal were filed for the State of Louisiana et al. by *Richard P. Ieyoub*, Attorney General of Louisiana, *Roy A. Mongrue, Jr.*, Assistant Attorney General, *Dorinda C. Bordlee*, Special Assistant Attorney General, *Mike Moore*, Attorney General of Mississippi, *Nikolas T. Nikas*, and *Stephen M. Crampton*; for the State of Texas by *John Cornyn*, Attorney General, *Andy Taylor*, First Assistant Attorney General, *Linda S. Eads*, Deputy Attorney General, *Gregory S. Coleman*, Solicitor General, and *Julie Caruthers Parsley*, Deputy Solicitor General; for the State of Wisconsin by *James E. Doyle*, Attorney General, and *Susan K. Ullman*, Assistant Attorney General; for Agudath Israel of America by *David Zwiebel*; for the American Center for Law and Justice et al. by *Jay Alan Sekulow, James M. Henderson, Sr., Walter M. Weber, Thomas P. Monaghan, Richard Thompson*, and *Edward L. White III*; for the Association of American Physicians and Surgeons et al. by *Teresa Stanton Collett*; for Family First by *Paul Benjamin Linton*; for Feminists for Life of America et al. by *Dwight G. Duncan*; for the Knights of Columbus by *Pat A. Cipollone* and *Carl A. Anderson*; for the National Association of Prolife Nurses, Inc., by *William C. Porth* and *Robert P. George*; for the National Right to Life Committee by *James Bopp, Jr., Richard E. Coleson*, and *Thomas J. Marzen*; for the Rutherford Institute by *Thomas W. Strahan, John W. Whitehead*, and *Steven H. Aden*; for the United States Catholic Conference et al. by *Mark E. Chopko* and *Michael F. Moses*; and for Representative Charles T. Canady et al. by *James Bopp, Jr., Richard E. Coleson*, and *Thomas J. Marzen*.

Briefs of *amici curiae* urging affirmance were filed for the United States by *Solicitor General Waxman, Deputy Solicitor General Underwood, Paul R. Q. Wolfson, Harriet S. Rabb, Marcy J. Wilder*, and *Kenneth Y. Choe*; for the State of California by *Bill Lockyer*, Attorney General, *Peter J. Siggins*, Chief Deputy Attorney General, and *Patricia A. Wynne*,

JUSTICE BREYER delivered the opinion of the Court.

We again consider the right to an abortion. We understand the controversial nature of the problem. Millions of Americans believe that life begins at conception and consequently that an abortion is akin to causing the death of an innocent child; they recoil at the thought of a law that would permit it. Other millions fear that a law that forbids abortion would condemn many American women to lives that lack dignity, depriving them of equal liberty and leading those with least resources to undergo illegal abortions with the attendant risks of death and suffering. Taking account of

Special Assistant Attorney General; for the State of New York et al. by *Eliot Spitzer,* Attorney General of New York, *Preeta D. Bansal,* Solicitor General, and *Jennifer K. Brown,* Assistant Attorney General, *Andrew Ketterer,* Attorney General of Maine, *Hardy Myers,* Attorney General of Oregon, and *William H. Sorrell,* Attorney General of Vermont; for the American Civil Liberties Union et al. by *Catherine Weiss, Steven R. Shapiro,* and *Colleen K. Connell;* for the American College of Obstetricians and Gynecologists et al. by *Adam L. Frank, A. Stephen Hut, Jr.,* and *Matthew A. Brill;* for the Naral Foundation et al. by *James P. Joseph, Nancy L. Perkins,* and *Elizabeth Arndorfer;* for Planned Parenthood of Wisconsin et al. by *Roger K. Evans, Eve C. Gartner,* and *Dara Klassel;* for the Religious Coalition for Reproductive Choice et al. by *Carrie Y. Flaxman;* for Seventy-five Organizations Committed to Women's Equality by *Susan Frietsche, Carol E. Tracy, Martha F. Davis, Roslyn Powell,* and *Yolanda S. Wu;* and for Senator Barbara Boxer et al. by *Robert Lewin, Kevin J. Curnin, Claude G. Szyfer,* and *Robert Abrams.*

Briefs of *amici curiae* were filed by the Commonwealth of Virginia et al. by *Mark L. Earley,* Attorney General of Virginia, *William H. Hurd,* Solicitor General, and *Daniel J. Poynor, Alison P. Landry,* and *Anthony P. Meredith,* Assistant Attorneys General, *Claire J. V. Richards, James Bopp, Jr., Richard E. Coleson, Thomas J. Marzen, Richard F. Collier, Jr.,* and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Alan G. Lance* of Idaho, *James E. Ryan* of Illinois, *Thomas J. Miller* of Iowa, *Jennifer M. Granholm* of Michigan, *Heidi Heitkamp* of North Dakota, *Betty D. Montgomery* of Ohio, *D. Michael Fisher* of Pennsylvania, *Charlie Condon* of South Carolina, *Mark Barnett* of South Dakota, and *Jan Graham* of Utah; and for the Family Research Council by *Teresa R. Wagner.*

these virtually irreconcilable points of view, aware that constitutional law must govern a society whose different members sincerely hold directly opposing views, and considering the matter in light of the Constitution's guarantees of fundamental individual liberty, this Court, in the course of a generation, has determined and then redetermined that the Constitution offers basic protection to the woman's right to choose. *Roe* v. *Wade,* 410 U. S. 113 (1973); *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992). We shall not revisit those legal principles. Rather, we apply them to the circumstances of this case.

Three established principles determine the issue before us. We shall set them forth in the language of the joint opinion in *Casey.* First, before "viability . . . the woman has a right to choose to terminate her pregnancy." *Id.,* at 870 (plurality opinion).

Second, "a law designed to further the State's interest in fetal life which imposes an undue burden on the woman's decision before fetal viability" is unconstitutional. *Id.,* at 877. An "undue burden is . . . shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Ibid.*

Third, " 'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.' " *Id.,* at 879 (quoting *Roe* v. *Wade, supra,* at 164–165).

We apply these principles to a Nebraska law banning "partial birth abortion." The statute reads as follows:

> "No partial birth abortion shall be performed in this state, unless such procedure is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or aris-

ing from the pregnancy itself." Neb. Rev. Stat. Ann. § 28–328(1) (Supp. 1999).

The statute defines "partial birth abortion" as:

"an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery." § 28–326(9).

It further defines "partially delivers vaginally a living unborn child before killing the unborn child" to mean

"deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." *Ibid.*

The law classifies violation of the statute as a "Class III felony" carrying a prison term of up to 20 years, and a fine of up to $25,000. §§ 28–328(2), 28–105. It also provides for the automatic revocation of a doctor's license to practice medicine in Nebraska. § 28–328(4).

We hold that this statute violates the Constitution.

# I

## A

Dr. Leroy Carhart is a Nebraska physician who performs abortions in a clinical setting. He brought this lawsuit in Federal District Court seeking a declaration that the Nebraska statute violates the Federal Constitution, and asking for an injunction forbidding its enforcement. After a trial on the merits, during which both sides presented several expert witnesses, the District Court held the statute unconstitutional. 11 F. Supp. 2d 1099 (Neb. 1998). On appeal, the Eighth Circuit affirmed. 192 F. 3d 1142 (1999); cf. *Hope Clinic* v. *Ryan,* 195 F. 3d 857 (CA7 1999) (en banc) (consider-

ing a similar statute, but reaching a different legal conclusion). We granted certiorari to consider the matter.

B

Because Nebraska law seeks to ban one method of aborting a pregnancy, we must describe and then discuss several different abortion procedures. Considering the fact that those procedures seek to terminate a potential human life, our discussion may seem clinically cold or callous to some, perhaps horrifying to others. There is no alternative way, however, to acquaint the reader with the technical distinctions among different abortion methods and related factual matters, upon which the outcome of this case depends. For that reason, drawing upon the findings of the trial court, underlying testimony, and related medical texts, we shall describe the relevant methods of performing abortions in technical detail.

The evidence before the trial court, as supported or supplemented in the literature, indicates the following:

1. About 90% of all abortions performed in the United States take place during the first trimester of pregnancy, before 12 weeks of gestational age. Centers for Disease Control and Prevention, Abortion Surveillance—United States, 1996, p. 41 (July 30, 1999) (hereinafter Abortion Surveillance). During the first trimester, the predominant abortion method is "vacuum aspiration," which involves insertion of a vacuum tube (cannula) into the uterus to evacuate the contents. Such an abortion is typically performed on an outpatient basis under local anesthesia. 11 F. Supp. 2d, at 1102; Obstetrics: Normal & Problem Pregnancies 1253–1254 (S. Gabbe, J. Niebyl, & J. Simpson eds. 3d ed. 1996). Vacuum aspiration is considered particularly safe. The procedure's mortality rates for first trimester abortion are, for example, 5 to 10 times lower than those associated with carrying the fetus to term. Complication rates are also low. Id., at 1251; Lawson et al., Abortion Mortality, United

States, 1972 through 1987, 171 Am. J. Obstet. Gynecol. 1365, 1368 (1994); M. Paul et al., A Clinicians Guide to Medical and Surgical Abortion 108–109 (1999) (hereinafter Medical and Surgical Abortion). As the fetus grows in size, however, the vacuum aspiration method becomes increasingly difficult to use. 11 F. Supp. 2d, at 1102–1103; Obstetrics: Normal & Problem Pregnancies, *supra*, at 1268.

2. Approximately 10% of all abortions are performed during the second trimester of pregnancy (12 to 24 weeks). Abortion Surveillance 41. In the early 1970's, inducing labor through the injection of saline into the uterus was the predominant method of second trimester abortion. *Id.*, at 8; *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 76 (1976). Today, however, the medical profession has switched from medical induction of labor to surgical procedures for most second trimester abortions. The most commonly used procedure is called "dilation and evacuation" (D&E). That procedure (together with a modified form of vacuum aspiration used in the early second trimester) accounts for about 95% of all abortions performed from 12 to 20 weeks of gestational age. Abortion Surveillance 41.

3. D&E "refers generically to transcervical procedures performed at 13 weeks gestation or later." American Medical Association, Report of Board of Trustees on Late-Term Abortion, App. 490 (hereinafter AMA Report). The AMA Report, adopted by the District Court, describes the process as follows.

Between 13 and 15 weeks of gestation:

> "D&E is similar to vacuum aspiration except that the cervix must be dilated more widely because surgical instruments are used to remove larger pieces of tissue. Osmotic dilators are usually used. Intravenous fluids and an analgesic or sedative may be administered. A local anesthetic such as a paracervical block may be administered, dilating agents, if used, are removed and instruments are inserted through the cervix into the

uterus to removal fetal and placental tissue. Because fetal tissue is friable and easily broken, the fetus may not be removed intact. The walls of the uterus are scraped with a curette to ensure that no tissue remains." *Id.*, at 490–491.

After 15 weeks:

"Because the fetus is larger at this stage of gestation (particularly the head), and because bones are more rigid, dismemberment or other destructive procedures are more likely to be required than at earlier gestational ages to remove fetal and placental tissue." *Id.*, at 491.

After 20 weeks:

"Some physicians use intrafetal potassium chloride or digoxin to induce fetal demise prior to a late D&E (after 20 weeks), to facilitate evacuation." *Id.*, at 491–492.

There are variations in D&E operative strategy; compare *ibid.* with W. Hern, Abortion Practice 146–156 (1984), and Medical and Surgical Abortion 133–135. However, the common points are that D&E involves (1) dilation of the cervix; (2) removal of at least some fetal tissue using nonvacuum instruments; and (3) (after the 15th week) the potential need for instrumental disarticulation or dismemberment of the fetus or the collapse of fetal parts to facilitate evacuation from the uterus.

4. When instrumental disarticulation incident to D&E is necessary, it typically occurs as the doctor pulls a portion of the fetus through the cervix into the birth canal. Dr. Carhart testified at trial as follows:

"Dr. Carhart: . . . 'The dismemberment occurs between the traction of . . . my instrument and the counter-traction of the internal os of the cervix . . . .

"Counsel: 'So the dismemberment occurs after you pulled a part of the fetus through the cervix, is that correct?

926

"Dr. Carhart: 'Exactly. Because you're using—The cervix has two strictures or two rings, the internal os and the external os . . . that's what's actually doing the dismembering.' . . .

"Counsel: 'When we talked before or talked before about a D&E, that is not—where there is not intention to do it intact, do you, in that situation, dismember the fetus in utero first, then remove portions?

"Dr. Carhart: 'I don't think so. . . . I don't know of any way that one could go in and intentionally dismember the fetus in the uterus. . . . It takes something that restricts the motion of the fetus against what you're doing before you're going to get dismemberment.'" 11 F. Supp. 2d, at 1104.

Dr. Carhart's specification of the location of fetal disarticulation is consistent with other sources. See Medical and Surgical Abortion 135; App. in Nos. 98–3245 and 98–3300 (CA8), p. 683, (testimony of Dr. Phillip Stubblefield) ("Q: So you don't actually dismember the fetus in utero, then take the pieces out? A: No").

5. The D&E procedure carries certain risks. The use of instruments within the uterus creates a danger of accidental perforation and damage to neighboring organs. Sharp fetal bone fragments create similar dangers. And fetal tissue accidentally left behind can cause infection and various other complications. See 11 F. Supp. 2d, at 1110; Gynecologic, Obstetric, and Related Surgery 1045 (D. Nichols & D. Clarke-Pearson eds. 2d ed. 2000); F. Cunningham et al., Williams Obstetrics 598 (20th ed. 1997). Nonetheless studies show that the risks of mortality and complication that accompany the D&E procedure between the 12th and 20th weeks of gestation are significantly lower than those accompanying induced labor procedures (the next safest midsecond trimester procedures). See Gynecologic, Obstetric, and Related Surgery, *supra*, at 1046; AMA Report, App. 495, 496; Medical

and Surgical Abortion 139, 142; Lawson, 171 Am. J. Obstet. Gynecol., at 1368.

6. At trial, Dr. Carhart and Dr. Stubblefield described a variation of the D&E procedure, which they referred to as an "intact D&E." See 11 F. Supp. 2d, at 1105, 1111. Like other versions of the D&E technique, it begins with induced dilation of the cervix. The procedure then involves removing the fetus from the uterus through the cervix "intact," *i. e.*, in one pass, rather than in several passes. *Ibid.* It is used after 16 weeks at the earliest, as vacuum aspiration becomes ineffective and the fetal skull becomes too large to pass through the cervix. *Id.*, at 1105. The intact D&E proceeds in one of two ways, depending on the presentation of the fetus. If the fetus presents head first (a vertex presentation), the doctor collapses the skull; and the doctor then extracts the entire fetus through the cervix. If the fetus presents feet first (a breech presentation), the doctor pulls the fetal body through the cervix, collapses the skull, and extracts the fetus through the cervix. *Ibid.* The breech extraction version of the intact D&E is also known commonly as "dilation and extraction," or D&X. *Id.*, at 1112. In the late second trimester, vertex, breech, and traverse/compound (sideways) presentations occur in roughly similar proportions. Medical and Surgical Abortion 135; 11 F. Supp. 2d, at 1108.

7. The intact D&E procedure can also be found described in certain obstetric and abortion clinical textbooks, where two variations are recognized. The first, as just described, calls for the physician to adapt his method for extracting the intact fetus depending on fetal presentation. See Gynecologic, Obstetric, and Related Surgery, *supra*, at 1043; Medical and Surgical Abortion 136–137. This is the method used by Dr. Carhart. See 11 F. Supp. 2d, at 1105. A slightly different version of the intact D&E procedure, associated with Dr. Martin Haskell, calls for conversion to a breech presentation in all cases. See Gynecologic, Obstetric, and Related

Surgery, *supra,* at 1043 (citing M. Haskell, Dilation and Extraction for Late Second Trimester Abortion (1992), in 139 Cong. Rec. 8605 (1993)).

8. The American College of Obstetricians and Gynecologists describes the D&X procedure in a manner corresponding to a breech-conversion intact D&E, including the following steps:

> "1. deliberate dilatation of the cervix, usually over a sequence of days;
>
> "2. instrumental conversion of the fetus to a footling breech;
>
> "3. breech extraction of the body excepting the head; and
>
> "4. partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus." American College of Obstetricians and Gynecologists Executive Board, Statement on Intact Dilation and Extraction (Jan. 12, 1997) (hereinafter ACOG Statement), App. 599–560.

Despite the technical differences we have just described, intact D&E and D&X are sufficiently similar for us to use the terms interchangeably.

9. Dr. Carhart testified he attempts to use the intact D&E procedure during weeks 16 to 20 because (1) it reduces the dangers from sharp bone fragments passing through the cervix, (2) minimizes the number of instrument passes needed for extraction and lessens the likelihood of uterine perforations caused by those instruments, (3) reduces the likelihood of leaving infection-causing fetal and placental tissue in the uterus, and (4) could help to prevent potentially fatal absorption of fetal tissue into the maternal circulation. See 11 F. Supp. 2d, at 1107. The District Court made no findings about the D&X procedure's overall safety. *Id.,* at 1126, n. 39. The District Court concluded, however, that "the evidence is both clear and convincing that Carhart's

D&X procedure is superior to, and safer than, the . . . other abortion procedures used during the relevant gestational period in the 10 to 20 cases a year that present to Dr. Carhart." *Id.*, at 1126.

10. The materials presented at trial referred to the potential benefits of the D&X procedure in circumstances involving nonviable fetuses, such as fetuses with abnormal fluid accumulation in the brain (hydrocephaly). See 11 F. Supp. 2d, at 1107 (quoting AMA Report, App. 492 (" 'Intact D&X may be preferred by some physicians, particularly when the fetus has been diagnosed with hydrocephaly or other anomalies incompatible with life outside the womb' ")); see also Grimes, The Continuing Need for Late Abortions, 280 JAMA 747, 748 (Aug. 26, 1998) (D&X "may be especially useful in the presence of fetal anomalies, such as hydrocephalus," because its reduction of the cranium allows "a smaller diameter to pass through the cervix, thus reducing risk of cervical injury"). Others have emphasized its potential for women with prior uterine scars, or for women for whom induction of labor would be particularly dangerous. See *Women's Medical Professional Corp.* v. *Voinovich*, 911 F. Supp. 2d 1051, 1067 (SD Ohio 1995); *Evans* v. *Kelley*, 977 F. Supp. 2d 1283, 1296 (ED Mich. 1997).

11. There are no reliable data on the number of D&X abortions performed annually. Estimates have ranged between 640 and 5,000 per year. Compare Henshaw, Abortion Incidence and Services in the United States, 1995–1996, 30 Family Planning Perspectives 263, 268 (1998), with Joint Hearing on S. 6 and H. R. 929 before the Senate Committee on the Judiciary and the Subcommittee on the Constitution of the House Committee on the Judiciary, 105th Cong., 1st Sess., 46 (1997).

## II

The question before us is whether Nebraska's statute, making criminal the performance of a "partial birth abortion," violates the Federal Constitution, as interpreted in

*Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992), and *Roe* v. *Wade,* 410 U. S. 113 (1973). We conclude that it does for at least two independent reasons. First, the law lacks any exception "'for the preservation of the ... health of the mother.'" *Casey,* 505 U. S., at 879 (plurality opinion). Second, it "imposes an undue burden on a woman's ability" to choose a D&E abortion, thereby unduly burdening the right to choose abortion itself. *Id.,* at 874. We shall discuss each of these reasons in turn.

## A

The *Casey* plurality opinion reiterated what the Court held in *Roe;* that "'subsequent to viability, the State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion *except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.*'" 505 U. S., at 879 (quoting *Roe, supra,* at 164–165) (emphasis added).

The fact that Nebraska's law applies both previability and postviability aggravates the constitutional problem presented. The State's interest in regulating abortion previability is considerably weaker than postviability. See *Casey, supra,* at 870. Since the law requires a health exception in order to validate even a postviability abortion regulation, it at a minimum requires the same in respect to previability regulation. See *Casey, supra,* at 880 (majority opinion) (assuming need for health exception previability); see also *Harris* v. *McRae,* 448 U. S. 297, 316 (1980).

The quoted standard also depends on the state regulations "promoting [the State's] interest in the potentiality of human life." The Nebraska law, of course, does not directly further an interest "in the potentiality of human life" by saving the fetus in question from destruction, as it regulates only a *method* of performing abortion. Nebraska describes its interests differently. It says the law "'show[s] concern for the life of the unborn,'" "prevent[s] cruelty to partially born chil-

dren," and "preserve[s] the integrity of the medical profession." Brief for Petitioners 48. But we cannot see how the interest-related differences could make any difference to the question at hand, namely, the application of the "health" requirement.

Consequently, the governing standard requires an exception "where it is necessary, in appropriate medical judgment for the preservation of the life or health of the mother," *Casey, supra,* at 879, for this Court has made clear that a State may promote but not endanger a woman's health when it regulates the methods of abortion. *Thornburgh* v. *American College of Obstetricians and Gynecologists,* 476 U. S. 747, 768–769 (1986); *Colautti* v. *Franklin,* 439 U. S. 379, 400 (1979); *Danforth,* 428 U. S., at 76–79; *Doe* v. *Bolton,* 410 U. S. 179, 197 (1973).

JUSTICE THOMAS says that the cases just cited limit this principle to situations where the pregnancy *itself* creates a threat to health. See *post,* at 1010. He is wrong. The cited cases, reaffirmed in *Casey,* recognize that a State cannot subject women's health to significant risks both in that context, *and also* where state regulations force women to use riskier methods of abortion. Our cases have repeatedly invalidated statutes that in the process of regulating the *methods* of abortion, imposed significant health risks. They make clear that a risk to a women's health is the same whether it happens to arise from regulating a particular method of abortion, or from barring abortion entirely. Our holding does not go beyond those cases, as ratified in *Casey.*

1

Nebraska responds that the law does not require a health exception unless there is a need for such an exception. And here there is no such need, it says. It argues that "safe alternatives remain available" and "a ban on partial-birth abortion/D&X would create no risk to the health of women." Brief for Petitioners 29, 40. The problem for Nebraska is

that the parties strongly contested this factual question in the trial court below; and the findings and evidence support Dr. Carhart. The State fails to demonstrate that banning D&X without a health exception may not create significant health risks for women, because the record shows that significant medical authority supports the proposition that in some circumstances, D&X would be the safest procedure.

We shall reiterate in summary form the relevant findings and evidence. On the basis of medical testimony the District Court concluded that "Carhart's D&X procedure is . . . safer tha[n] the D&E and other abortion procedures used during the relevant gestational period in the 10 to 20 cases a year that present to Dr. Carhart." 11 F. Supp. 2d, at 1126. It found that the D&X procedure permits the fetus to pass through the cervix with a minimum of instrumentation. *Ibid.* It thereby

> "reduces operating time, blood loss and risk of infection; reduces complications from bony fragments; reduces instrument-inflicted damage to the uterus and cervix; prevents the most common causes of maternal mortality (DIC and amniotic fluid embolus); and eliminates the possibility of 'horrible complications' arising from retained fetal parts." *Ibid.*

The District Court also noted that a select panel of the American College of Obstetricians and Gynecologists concluded that D&X " 'may be the best or most appropriate procedure in a particular circumstance to save the life or preserve the health of a woman.'" *Id.,* at 1105, n. 10 (quoting ACOG Statement, App. 600–601) (but see an important qualification, *infra,* at 934). With one exception, the federal trial courts that have heard expert evidence on the matter have reached similar factual conclusions. See *Rhode Island Medical Soc.* v. *Whitehouse,* 66 F. Supp. 2d 288, 314 (RI 1999); *A Choice for Women* v. *Butterworth,* 54 F. Supp. 2d 1148, 1153, 1156 (SD Fla. 1998); *Causeway Medical Suite* v. *Foster,* 43 F. Supp. 2d 604, 613–614 (ED La. 1999); *Richmond*

*Medical Center for Women* v. *Gilmore*, 11 F. Supp. 2d 795, 827, n. 40 (ED Va. 1998); *Hope Clinic* v. *Ryan*, 995 F. Supp. 2d 847, 852 (ND Ill. 1998), vacated, 195 F. 3d 857 (CA7 1999), cert. pending, No. 99–1152; *Voinovich*, 911 F. Supp. 2d, at 1069–1070; *Kelley*, 977 F. Supp. 2d, at 1296; but see *Planned Parenthood of Wis.* v. *Doyle*, 44 F. Supp. 2d 975, 980 (WD Wis.), vacated, 195 F. 3d 857 (CA7 1999).

### 2

Nebraska, along with supporting *amici*, replies that these findings are irrelevant, wrong, or applicable only in a tiny number of instances. It says (1) that the D&X procedure is "little-used," (2) by only "a handful of doctors." Brief for Petitioners 32. It argues (3) that D&E and labor induction are at all times "safe alternative procedures." *Id.*, at 36. It refers to the testimony of petitioners' medical expert, who testified (4) that the ban would not increase a woman's risk of several rare abortion complications (disseminated intravascular coagulopathy and amniotic fluid embolus), *id.*, at 37; App. 642–644.

The Association of American Physicians and Surgeons et al., *amici* supporting Nebraska, argue (5) that elements of the D&X procedure may create special risks, including cervical incompetence caused by overdilitation, injury caused by conversion of the fetal presentation, and dangers arising from the "blind" use of instrumentation to pierce the fetal skull while lodged in the birth canal. See Brief for Association of American Physicians and Surgeons et al. as *Amici Curiae* 21–23; see also Sprang & Neerhof, Rationale for Banning Abortions Late in Pregnancy, 280 JAMA 744, 746 (Aug. 26, 1998).

Nebraska further emphasizes (6) that there are no medical studies "establishing the safety of the partial-birth abortion/ D&X procedure," Brief for Petitioners 39, and "no medical studies comparing the safety of partial-birth abortion/D&X to other abortion procedures," *ibid.* It points to, *id.*, at 35,

(7) an American Medical Association policy statement that "'there does not appear to be any identified situation in which intact D&X is the only appropriate procedure to induce abortion,'" Late Term Pregnancy Termination Techniques, AMA Policy H–5.982 (1997). And it points out (8) that the American College of Obstetricians and Gynecologists qualified its statement that D&X "may be the best or most appropriate procedure," by adding that the panel "could identify no circumstances under which [the D&X] procedure . . . would be the only option to save the life or preserve the health of the woman." App. 600–601.

3

We find these eight arguments insufficient to demonstrate that Nebraska's law needs no health exception. For one thing, certain of the arguments are beside the point. The D&X procedure's relative rarity (argument (1)) is not highly relevant. The D&X is an infrequently used abortion procedure; but the health exception question is whether protecting women's health requires an exception for those infrequent occasions. A rarely used treatment might be necessary to treat a rarely occurring disease that could strike anyone—the State cannot prohibit a person from obtaining treatment simply by pointing out that most people do not need it. Nor can we know whether the fact that only a "handful" of doctors use the procedure (argument (2)) reflects the comparative rarity of late second term abortions, the procedure's recent development, Gynecologic, Obstetric, and Related Surgery, at 1043, the controversy surrounding it, or, as Nebraska suggests, the procedure's lack of utility.

For another thing, the record responds to Nebraska's (and amici's) medically based arguments. In respect to argument (3), for example, the District Court agreed that alternatives, such as D&E and induced labor, are "safe" but found that the D&X method was significantly safer in certain circumstances. 11 F. Supp. 2d, at 1125–1126. In respect to

argument (4), the District Court simply·relied on different expert testimony—testimony stating that "'[a]nother advantage of the Intact D&E is that it eliminates the risk of embolism of cerebral tissue into the woman's blood stream.'" *Id.,* at 1124 (quoting Hearing on H. R. 1833 before the Senate Committee on the Judiciary, 104th Cong., 1st Sess., 260 (1995) (statement of W. Hern).

In response to *amici*'s argument (5), the American College of Obstetricians and Gynecologists, in its own *amici* brief, denies that D&X generally poses risks greater than the alternatives. It says that the suggested alternative procedures involve similar or greater risks of cervical and uterine injury, for "D&E procedures, involve similar amounts of dilitation" and "of course childbirth involves even greater cervical dilitation." Brief for American College of Obstetricians and Gynecologists et al. as *Amici Curiae* 23. The College points out that Dr. Carhart does not reposition the fetus thereby avoiding any risks stemming from conversion to breech presentation, and that, as compared with D&X, D&E involves the same, if not greater, "blind" use of sharp instruments in the uterine cavity. *Id.,* at 23–24.

We do not quarrel with Nebraska's argument (6), for Nebraska is right. There are no general medical studies documenting comparative safety. Neither do we deny the import of the American Medical Association's statement (argument (7))—even though the State does omit the remainder of that statement: "The AMA recommends that the procedure not be used *unless alternative procedures pose materially greater risk to the woman.*" Late Term Pregnancy Termination Techniques, AMA Policy H–5.982 (emphasis added).

We cannot, however, read the American College of Obstetricians and Gynecologists panel's qualification (that it could not "identify" a circumstance where D&X was the "only" life- or health-preserving option) as if, according to Nebraska's argument (8), it denied the potential health-related need

for D&X. That is because the College writes the following in its *amici* brief:

> "Depending on the physician's skill and experience, the D&X procedure can be the most appropriate abortion procedure for some women in some circumstances. D&X presents a variety of potential safety advantages over other abortion procedures used during the same gestational period. Compared to D&Es involving dismemberment, D&X involves less risk of uterine perforation or cervical laceration because it requires the physician to make fewer passes into the uterus with sharp instruments and reduces the presence of sharp fetal bone fragments that can injure the uterus and cervix. There is also considerable evidence that D&X reduces the risk of retained fetal tissue, a serious abortion complication that can cause maternal death, and that D&X reduces the incidence of a 'free floating' fetal head that can be difficult for a physician to grasp and remove and can thus cause maternal injury. That D&X procedures usually take less time than other abortion methods used at a comparable stage of pregnancy can also have health advantages. The shorter the procedure, the less blood loss, trauma, and exposure to anesthesia. The intuitive safety advantages of intact D&E are supported by clinical experience. Especially for women with particular health conditions, there is medical evidence that D&X may be safer than available alternatives." Brief for American College of Obstetricians and Gynecologists et al. as *Amici Curiae* 21–22 (citation and footnotes omitted).

4

The upshot is a District Court finding that D&X significantly obviates health risks in certain circumstances, a highly plausible record-based explanation of why that might be so, a division of opinion among some medical experts over

whether D&X is generally safer, and an absence of controlled medical studies that would help answer these medical questions. Given these medically related evidentiary circumstances, we believe the law requires a health exception.

The word "necessary" in *Casey*'s phrase "necessary, in appropriate medical judgment, for the preservation of the life or health of the mother," 505 U. S., at 879 (internal quotation marks omitted), cannot refer to an absolute necessity or to absolute proof. Medical treatments and procedures are often considered appropriate (or inappropriate) in light of estimated comparative health risks (and health benefits) in particular cases. Neither can that phrase require unanimity of medical opinion. Doctors often differ in their estimation of comparative health risks and appropriate treatment. And *Casey*'s words "appropriate medical judgment" must embody the judicial need to tolerate responsible differences of medical opinion—differences of a sort that the American Medical Association and American College of Obstetricians and Gynecologists' statements together indicate are present here.

For another thing, the division of medical opinion about the matter at most means uncertainty, a factor that signals the presence of risk, not its absence. That division here involves highly qualified knowledgeable experts on both sides of the issue. Where a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view, we cannot say that the presence of a different view by itself proves the contrary. Rather, the uncertainty means a significant likelihood that those who believe that D&X is a safer abortion method in certain circumstances may turn out to be right. If so, then the absence of a health exception will place women at an unnecessary risk of tragic health consequences. If they are wrong, the exception will simply turn out to have been unnecessary.

In sum, Nebraska has not convinced us that a health exception is "never necessary to preserve the health of

women." Reply Brief for Petitioners 4. Rather, a statute that altogether forbids D&X creates a significant health risk. The statute consequently must contain a health exception. This is not to say, as JUSTICE THOMAS and JUSTICE KENNEDY claim, that a State is prohibited from proscribing an abortion procedure whenever a particular physician deems the procedure preferable. By no means must a State grant physicians "unfettered discretion" in their selection of abortion methods. *Post*, at 969 (KENNEDY, J., dissenting). But where substantial medical authority supports the proposition that banning a particular abortion procedure could endanger women's health, *Casey* requires the statute to include a health exception when the procedure is "'necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" 505 U. S., at 879. Requiring such an exception in this case is no departure from *Casey*, but simply a straightforward application of its holding.

### B

The Eighth Circuit found the Nebraska statute unconstitutional because, in *Casey*'s words, it has the "effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Id.*, at 877. It thereby places an "undue burden" upon a woman's right to terminate her pregnancy before viability. *Ibid.* Nebraska does not deny that the statute imposes an "undue burden" *if* it applies to the more commonly used D&E procedure as well as to D&X. And we agree with the Eighth Circuit that it does so apply.

Our earlier discussion of the D&E procedure, *supra*, at 924–926, shows that it falls within the statutory prohibition. The statute forbids "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child." Neb. Rev. Stat. Ann. § 28–326(9) (Supp. 1999). We

do not understand how one could distinguish, using this language, between D&E (where a foot or arm is drawn through the cervix) and D&X (where the body up to the head is drawn through the cervix). Evidence before the trial court makes clear that D&E will often involve a physician pulling a "substantial portion" of a still living fetus, say, an arm or leg, into the vagina prior to the death of the fetus. 11 F. Supp. 2d, at 1128; *id.*, at 1128–1130. Indeed D&E involves dismemberment that commonly occurs only when the fetus meets resistance that restricts the motion of the fetus: "The dismemberment occurs between the traction of . . . [the] instrument and the counter-traction of the internal os of the cervix." *Id.*, at 1128. And these events often do not occur until after a portion of a living fetus has been pulled into the vagina. *Id.*, at 1104; see also Medical and Surgical Abortion 135 ("During the mid-second trimester, separation of the fetal corpus may occur when the fetus is drawn into the lower uterine segment, where compression and traction against the endocervix facilitates disarticulation").

Even if the statute's basic aim is to ban D&X, its language makes clear that it also covers a much broader category of procedures. The language does not track the medical differences between D&E and D&X—though it would have been a simple matter, for example, to provide an exception for the performance of D&E and other abortion procedures. *E. g.,* Kan. Stat. Ann. § 65–6721(b)(1) (Supp. 1999). Nor does the statute anywhere suggest that its application turns on whether a portion of the fetus' body is drawn into the vagina as part of a process to extract an intact fetus after collapsing the head as opposed to a process that would dismember the fetus. Thus, the dissenters' argument that the law was generally intended to bar D&X can be both correct and irrelevant. The relevant question is *not* whether the legislature wanted to ban D&X; it is whether the law was intended to apply *only* to D&X. The plain language covers both procedures. A rereading of this opinion, *supra,* at 924–929, as

well as JUSTICE THOMAS' dissent, *post*, at 984–987, will make clear why we can find no difference, in terms of *this* statute, between the D&X procedure as described and the D&E procedure as it might be performed. (In particular, compare *post*, at 984–986 (THOMAS, J., dissenting), with *post*, at 986–989 (THOMAS, J., dissenting).) Both procedures can involve the introduction of a "substantial portion" of a still living fetus, through the cervix, into the vagina—the very feature of an abortion that leads JUSTICE THOMAS to characterize such a procedure as involving "partial birth."

The Nebraska State Attorney General argues that the statute does differentiate between the two procedures. He says that the statutory words "substantial portion" mean "the child up to the head." He consequently denies the statute's application where the physician introduces into the birth canal a fetal arm or leg or anything less than the entire fetal body. Brief for Petitioners 20. He argues further that we must defer to his views about the meaning of the state statute. *Id.*, at 12–13.

We cannot accept the Attorney General's narrowing interpretation of the Nebraska statute. This Court's case law makes clear that we are not to give the Attorney General's interpretative views controlling weight. For one thing, this Court normally follows lower federal-court interpretations of state law. *McMillian* v. *Monroe County*, 520 U. S. 781, 786 (1997); *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 500, n. 9 (1985). It "rarely reviews a construction of state law agreed upon by the two lower federal courts." *Virginia* v. *American Booksellers Assn., Inc.*, 484 U. S. 383, 395 (1988). In this case, the two lower courts have both rejected the Attorney General's narrowing interpretation.

For another, our precedent warns against accepting as "authoritative" an Attorney General's interpretation of state law when "the Attorney General does not bind the state courts or local law enforcement authorities." *Ibid.*

Under Nebraska law, the Attorney General's interpretative views do not bind the state courts. *State* v. *Coffman*, 213 Neb. 560, 561, 330 N. W. 2d 727, 728 (1983) (Attorney General's issued opinions, while entitled to "substantial weight" and "to be respectfully considered," are of "no controlling authority"). Nor apparently do they bind elected county attorneys, to whom Nebraska gives an independent authority to initiate criminal prosecutions. Neb. Rev. Stat. Ann. §§ 23–1201(1), 28–328(5), 84–205(3) (Supp. 1999); cf. *Crandon* v. *United States*, 494 U. S. 152, 177 (1990) (SCALIA, J., concurring in judgment) ("[W]e have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference").

Nor can we say that the lower courts used the wrong legal standard in assessing the Attorney General's interpretation. The Eighth Circuit recognized its "duty to give [the law] a construction . . . that would avoid constitutional doubts." 192 F. 3d, at 1150. It nonetheless concluded that the Attorney General's interpretation would "twist the words of the law and give them a meaning they cannot reasonably bear." *Ibid.* The Eighth Circuit is far from alone in rejecting such a narrowing interpretation. The language in question is based on model statutory language (though some States omit any further definition of "partial birth abortion"), which 10 lower federal courts have considered on the merits. All 10 of those courts (including the Eighth Circuit) have found the language potentially applicable to other abortion procedures. See *Planned Parenthood of Greater Iowa, Inc.* v. *Miller*, 195 F. 3d 386 (CA8 1999); *Little Rock Family Planning Services* v. *Jegley*, 192 F. 3d 794, 797–798 (CA8 1999); *Hope Clinic*, 195 F. 3d, at 865–871 (imposing precautionary injunction to prevent application beyond D&X); *id.*, at 885–889 (Posner, C. J., dissenting); *Rhode Island Medical Soc.*, 66 F. Supp. 2d, at 309–310; *Richmond Medical Center for Women*, 55

F. Supp. 2d, at 471; *A Choice for Women,* 54 F. Supp. 2d, at 1155; *Causeway Medical Suite,* 43 F. Supp. 2d, at 614–615; *Planned Parenthood of Central N. J.* v. *Verniero,* 41 F. Supp. 2d 478, 503–504 (NJ 1998); *Eubanks* v. *Stengel,* 28 F. Supp. 2d 1024, 1034–1035 (WD Ky. 1998); *Planned Parenthood of Southern Ariz., Inc.* v. *Woods,* 982 F. Supp. 2d 1369, 1378 (Ariz. 1997); *Kelley,* 977 F. Supp. 2d, at 1317; but cf. *Richmond Medical Center* v. *Gilmore,* 144 F. 3d 326, 330–332 (CA4 1998) (Luttig, J., granting stay).

Regardless, even were we to grant the Attorney General's views "substantial weight," we still have to reject his interpretation, for it conflicts with the statutory language discussed *supra,* at 940. The Attorney General, echoed by the dissents, tries to overcome that language by relying on other language in the statute; in particular, the words "partial birth abortion," a term ordinarily associated with the D&X procedure, and the words "partially delivers vaginally a living unborn child." Neb. Rev. Stat. Ann. §28–326(9) (Supp. 1999). But these words cannot help the Attorney General. They are subject to the statute's further *explicit statutory definition,* specifying that both terms include "delivering into the vagina a living unborn child, or a substantial portion thereof." *Ibid.* When a statute includes an explicit definition, we must follow that definition, even if it varies from that term's ordinary meaning. *Meese* v. *Keene,* 481 U. S. 465, 484–485 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term"); *Colautti* v. *Franklin,* 439 U. S., at 392–393, n. 10 ("As a rule, 'a definition which declares what a term "means" . . . excludes any meaning that is not stated'"); *Western Union Telegraph Co.* v. *Lenroot,* 323 U. S. 490, 502 (1945); *Fox* v. *Standard Oil Co. of N. J.,* 294 U. S. 87, 95–96 (1935) (Cardozo, J.); see also 2A N. Singer, Sutherland on Statutes and Statutory Construction §47.07, p. 152, and n. 10 (5th ed. 1992) (collecting cases). That is to say, the statute, read "as a whole," *post,* at 998

(THOMAS, J., dissenting), leads the reader to a definition. That definition does not include the Attorney General's restriction—"the child up to the head." Its words, "substantial portion," indicate the contrary.

The Attorney General also points to the Nebraska Legislature's debates, where the term "partial birth abortion" appeared frequently. But those debates hurt his argument more than they help it. Nebraska's legislators focused directly upon the meaning of the word "substantial." One senator asked the bill's sponsor, "[Y]ou said that as small a portion of the fetus as a foot would constitute a substantial portion in your opinion. Is that correct?" The sponsoring senator replied, "Yes, I believe that's correct." App. 452–453; see also id., at 442–443 (same senator explaining "substantial" would "indicate that more than a little bit has been delivered into the vagina," i. e., "[e]nough that would allow for the procedure to end up with the killing of the unborn child"); id., at 404 (rejecting amendment to limit law to D&X). The legislature seems to have wanted to avoid more limiting language lest it become too easy to evade the statute's strictures—a motive that JUSTICE THOMAS well explains. Post, at 1001–1003. That goal, however, exacerbates the problem.

The Attorney General, again echoed by the dissents, further argues that the statute "distinguishes between the overall 'abortion procedure' itself and the separate 'procedure' used to kill the unborn child." Brief for Petitioners 16–18; post, at 991–992 (opinion of THOMAS, J.), 975–976 (opinion of KENNEDY, J.). Even assuming that the distinction would help the Attorney General make the D&E/D&X distinction he seeks, however, we cannot find any language in the statute that supports it. He wants us to read "procedure" in the statute's last sentence to mean "separate procedure," i. e., the killing of the fetus, as opposed to a whole procedure, i. e., a D&E or D&X abortion. But the critical word "separate" is missing. And the same

word "procedure," in the same subsection and throughout the statute, is used to refer to an entire abortion procedure. Neb. Rev. Stat. Ann. §§ 28–326(9), 28–328(1)–(4) (Supp. 1999); cf. *Gustafson* v. *Alloyd Co.*, 513 U. S. 561, 570 (1995) ("[I]dentical words used in different parts of the same act are intended to have the same meaning" (internal quotation marks omitted)).

The dissenters add that the statutory words "partially delivers" can be read to exclude D&E. *Post*, at 990–991 (opinion of THOMAS, J.), 974 (opinion of KENNEDY, J.). They say that introduction of, say, a limb or both limbs into the vagina does not involve "delivery." But obstetric textbooks and even dictionaries routinely use that term to describe any facilitated removal of tissue from the uterus, not only the removal of an intact fetus. *E. g.*, Obstetrics: Normal & Problem Pregnancies, at 388 (describing "delivery" of fetal membranes, placenta, and umbilical cord in the third stage of labor); B. Maloy, Medical Dictionary for Lawyers 221 (3d ed. 1960) ("Also, the removal of a [fetal] part such as the placenta"); 4 Oxford English Dictionary 422 (2d ed. 1989) (to "deliver" means, *inter alia*, to "disburden (a women) of the foetus"); Webster's Third New International Dictionary (1993) ("[D]elivery" means "the expulsion or extraction of a fetus and its membranes"). In any event, the statute itself specifies that it applies *both* to delivering "an intact unborn child" *or* "a substantial portion thereof." The dissents cannot explain how introduction of a substantial portion of a fetus into the vagina pursuant to D&X is a "delivery," while introduction pursuant to D&E is not.

We are aware that adopting the Attorney General's interpretation might avoid the constitutional problem discussed in this section. But we are "without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent." *Boos* v. *Barry*, 485 U. S. 312, 330 (1988); *Gooding* v. *Wilson*, 405 U. S. 518, 520–

521 (1972). For the reasons stated, it is not reasonable to replace the term "substantial portion" with the Attorney General's phrase "body up to the head." See *Almendarez-Torres* v. *United States,* 523 U. S. 224, 237–239 (1998) (statute must be "genuinely susceptible" to two interpretations).

Finally, the law does not require us to certify the state-law question to the Nebraska Supreme Court. Of course, we lack any authoritative state-court construction. But "we have never held that a federal litigant must await a state-court construction or the development of an established practice before bringing the federal suit." *City of Lakewood* v. *Plain Dealer Publishing Co.,* 486 U. S. 750, 770, n. 11 (1988). The Attorney General did not seek a narrowing interpretation from the Nebraska Supreme Court nor did he ask the federal courts to certify the interpretive question. See Brief for State Appellants in Nos. 98–3245 and 98–3300 (CA8); cf. *Arizonans for Official English* v. *Arizona,* 520 U. S. 43 (1997). Even if we were inclined to certify the question now, we cannot do so. Certification of a question (or abstention) is appropriate only where the statute is "fairly susceptible" to a narrowing construction, see *Houston* v. *Hill,* 482 U. S. 451, 468–471 (1987). We believe it is not. Moreover, the Nebraska Supreme Court grants certification only if the certified question is "determinative of the cause." Neb. Rev. Stat. § 24–219 (1995); see also *Houston* v. *Hill, supra,* at 471 ("It would be manifestly inappropriate to certify a question in a case where . . . there is no uncertain question of state law whose resolution might affect the pending federal claim"). Here, it would not be determinative, in light of the discussion in Part II–A, *supra.*

In sum, using this law some present prosecutors and future Attorneys General may choose to pursue physicians who use D&E procedures, the most commonly used method for performing previability second trimester abortions. All those who perform abortion procedures using that method must fear prosecution, conviction, and imprisonment. The

result is an undue burden upon a woman's right to make an abortion decision. We must consequently find the statute unconstitutional.

The judgment of the Court of Appeals is

*Affirmed.*

JUSTICE STEVENS, with whom JUSTICE GINSBURG joins, concurring.

Although much ink is spilled today describing the gruesome nature of late-term abortion procedures, that rhetoric does not provide me a *reason* to believe that the procedure Nebraska here claims it seeks to ban is more brutal, more gruesome, or less respectful of "potential life" than the equally gruesome procedure Nebraska claims it still allows. JUSTICE GINSBURG and Judge Posner have, I believe, correctly diagnosed the underlying reason for the enactment of this legislation—a reason that also explains much of the Court's rhetoric directed at an objective that extends well beyond the narrow issue that this case presents. The rhetoric is almost, but not quite, loud enough to obscure the quiet fact that during the past 27 years, the central holding of *Roe* v. *Wade,* 410 U. S. 113 (1973), has been endorsed by all but 4 of the 17 Justices who have addressed the issue. That holding—that the word "liberty" in the Fourteenth Amendment includes a woman's right to make this difficult and extremely personal decision—makes it impossible for me to understand how a State has any legitimate interest in requiring a doctor to follow any procedure other than the one that he or she reasonably believes will best protect the woman in her exercise of this constitutional liberty. But one need not even approach this view today to conclude that Nebraska's law must fall. For the notion that either of these two equally gruesome procedures performed at this late stage of gestation is more akin to infanticide than the other, or that the State furthers any legitimate interest by banning one but

not the other, is simply irrational. See U. S. Const., Amdt. 14.

JUSTICE O'CONNOR, concurring.

The issue of abortion is one of the most contentious and controversial in contemporary American society. It presents extraordinarily difficult questions that, as the Court recognizes, involve "virtually irreconcilable points of view." *Ante*, at 921. The specific question we face today is whether Nebraska's attempt to proscribe a particular method of abortion, commonly known as "partial birth abortion," is constitutional. For the reasons stated in the Court's opinion, I agree that Nebraska's statute cannot be reconciled with our decision in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), and is therefore unconstitutional. I write separately to emphasize the following points.

First, the Nebraska statute is inconsistent with *Casey* because it lacks an exception for those instances when the banned procedure is necessary to preserve the health of the mother. See *id.*, at 879 (plurality opinion). Importantly, Nebraska's own statutory scheme underscores this constitutional infirmity. As we held in *Casey*, prior to viability "the woman has a right to choose to terminate her pregnancy." *Id.*, at 870. After the fetus has become viable, States may substantially regulate and even proscribe abortion, but any such regulation or proscription must contain an exception for instances "'where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother.'" *Id.*, at 879 (quoting *Roe* v. *Wade*, 410 U. S. 113, 165 (1973)). Nebraska has recognized this constitutional limitation in its separate statute generally proscribing postviability abortions. See Neb. Rev. Stat. Ann. § 28–329 (Supp. 1999). That statute provides that "[n]o abortion shall be performed after the time at which, in the sound medical judgment of the attending physician, the unborn child clearly appears to have reached viability, *except when necessary to*

*preserve the life or health of the mother." Ibid.* (emphasis added). Because even a postviability proscription of abortion would be invalid absent a health exception, Nebraska's ban on previability partial birth abortions, under the circumstances presented here, must include a health exception as well, since the State's interest in regulating abortions before viability is "considerably weaker" than after viability. *Ante,* at 930. The statute at issue here, however, only excepts those procedures "necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury." Neb. Rev. Stat. Ann. § 28–328(1) (Supp. 1999). This lack of a health exception necessarily renders the statute unconstitutional.

Contrary to the assertions of JUSTICE KENNEDY and JUSTICE THOMAS, the need for a health exception does not arise from "the individual views of Dr. Carhart and his supporters." *Post,* at 969 (KENNEDY, J., dissenting); see also *post,* at 1012–1013 (THOMAS, J., dissenting). Rather, as the majority explains, where, as here, "a significant body of medical opinion believes a procedure may bring with it greater safety for some patients and explains the medical reasons supporting that view," *ante,* at 937, then Nebraska cannot say that the procedure will not, in some circumstances, be "necessary to preserve the life or health of the mother." Accordingly, our precedent requires that the statute include a health exception.

Second, Nebraska's statute is unconstitutional on the alternative and independent ground that it imposes an undue burden on a woman's right to choose to terminate her pregnancy before viability. Nebraska's ban covers not just the dilation and extraction (D&X) procedure, but also the dilation and evacuation (D&E) procedure, "the most commonly used method for performing previability second trimester abortions." *Ante,* at 945. The statute defines the banned procedure as "deliberately and intentionally delivering into the vagina a living unborn child, *or a substantial portion*

*thereof,* for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." Neb. Rev. Stat. Ann. § 28–326(9) (Supp. 1999) (emphasis added). As the Court explains, the medical evidence establishes that the D&E procedure is included in this definition. Thus, it is not possible to interpret the statute's language as applying only to the D&X procedure. Moreover, it is significant that both the District Court and the Court of Appeals interpreted the statute as prohibiting abortions performed using the D&E method as well as the D&X method. See 192 F. 3d 1142, 1150 (CA8 1999); 11 F. Supp. 2d 1099, 1127–1131 (Neb. 1998). We have stated on several occasions that we ordinarily defer to the construction of a state statute given it by the lower federal courts unless such a construction amounts to plain error. See, *e. g., Bishop* v. *Wood,* 426 U. S. 341, 346 (1976) ("[T]his Court has accepted the interpretation of state law in which the District Court and the Court of Appeals have concurred even if an examination of the state-law issue without such guidance might have justified a different conclusion"); *The Tungus* v. *Skovgaard,* 358 U. S. 588, 596 (1959). Such deference is not unique to the abortion context, but applies generally to state statutes addressing all areas of the law. See, *e. g., UNUM Life Ins. Co. of America* v. *Ward,* 526 U. S. 358, 368 (1999) ("notice-prejudice" rule in state insurance law); *Brockett* v. *Spokane Arcades, Inc.,* 472 U. S. 491, 499 (1985) (moral nuisance law); *Runyon* v. *McCrary,* 427 U. S. 160, 181 (1976) (statute of limitations for personal injury actions); *Bishop* v. *Wood, supra,* at 346, n. 10 (city employment ordinance). Given this construction, the statute is impermissible. Indeed, Nebraska conceded at oral argument that "the State could not prohibit the D&E procedure." Tr. of Oral Arg. 10. By proscribing the most commonly used method for previability second trimester abortions, see *ante,* at 924, the statute creates a "substantial obstacle to a woman seeking an abortion," *Casey, supra,* at 884, and therefore imposes

an undue burden on a woman's right to terminate her pregnancy prior to viability.

It is important to note that, unlike Nebraska, some other States have enacted statutes more narrowly tailored to proscribing the D&X procedure alone. Some of those statutes have done so by specifically excluding from their coverage the most common methods of abortion, such as the D&E and vacuum aspiration procedures. For example, the Kansas statute states that its ban does not apply to the "(A) [s]uction curettage abortion procedure; (B) suction aspiration abortion procedure; or (C) dilation and evacuation abortion procedure involving dismemberment of the fetus prior to removal from the body of the pregnant woman." Kan. Stat. Ann. § 65–6721(b)(2) (Supp. 1998). The Utah statute similarly provides that its prohibition "does not include the dilation and evacuation procedure involving dismemberment prior to removal, the suction curettage procedure, or the suction aspiration procedure for abortion." Utah Code Ann. § 76–7–310.5(1)(a) (1999). Likewise, the Montana statute defines the banned procedure as one in which "(A) the living fetus is removed intact from the uterus until only the head remains in the uterus; (B) all or a part of the intracranial contents of the fetus are evacuated; (C) the head of the fetus is compressed; and (D) following fetal demise, the fetus is removed from the birth canal." Mont. Code Ann. § 50–20–401(3)(c)(ii) (Supp. 1999). By restricting their prohibitions to the D&X procedure exclusively, the Kansas, Utah, and Montana statutes avoid a principal defect of the Nebraska law.

If Nebraska's statute limited its application to the D&X procedure and included an exception for the life and health of the mother, the question presented would be quite different from the one we face today. As we held in *Casey*, an abortion regulation constitutes an undue burden if it "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus."

505 U. S., at 877. If there were adequate alternative methods for a woman safely to obtain an abortion before viability, it is unlikely that prohibiting the D&X procedure alone would "amount in practical terms to a substantial obstacle to a woman seeking an abortion." *Id.*, at 884. Thus, a ban on partial birth abortion that only proscribed the D&X method of abortion and that included an exception to preserve the life and health of the mother would be constitutional in my view.

Nebraska's statute, however, does not meet these criteria. It contains no exception for when the procedure, in appropriate medical judgment, is necessary to preserve the health of the mother; and it proscribes not only the D&X procedure but also the D&E procedure, the most commonly used method for previability second trimester abortions, thus making it an undue burden on a woman's right to terminate her pregnancy. For these reasons, I agree with the Court that Nebraska's law is unconstitutional.

JUSTICE GINSBURG, with whom JUSTICE STEVENS joins, concurring.

I write separately only to stress that amidst all the emotional uproar caused by an abortion case, we should not lose sight of the character of Nebraska's "partial birth abortion" law. As the Court observes, this law does not save any fetus from destruction, for it targets only "a *method* of performing abortion." *Ante*, at 930. Nor does the statute seek to protect the lives or health of pregnant women. Moreover, as JUSTICE STEVENS points out, *ante*, at 946 (concurring opinion), the most common method of performing previability second trimester abortions is no less distressing or susceptible to gruesome description. Seventh Circuit Chief Judge Posner correspondingly observed, regarding similar bans in Wisconsin and Illinois, that the law prohibits the D&X procedure "not because the procedure kills the fetus, not because it risks worse complications for the woman

than alternative procedures would do, not because it is a crueler or more painful or more disgusting method of terminating a pregnancy." *Hope Clinic* v. *Ryan*, 195 F. 3d 857, 881 (CA7 1999) (dissenting opinion). Rather, Chief Judge Posner commented, the law prohibits the procedure because the state legislators seek to chip away at the private choice shielded by *Roe* v. *Wade*, 410 U. S. 113 (1973), even as modified by *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). 195 F. 3d, at 880–882.

A state regulation that "has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" violates the Constitution. *Casey*, 505 U. S., at 877 (plurality opinion). Such an obstacle exists if the State stops a woman from choosing the procedure her doctor "reasonably believes will best protect the woman in [the] exercise of [her] constitutional liberty." *Ante*, at 946 (STEVENS, J., concurring); see *Casey*, 505 U. S., at 877 ("means chosen by the State to further the interest in potential life must be calculated to inform the woman's free choice, not hinder it"). Again as stated by Chief Judge Posner, "if a statute burdens constitutional rights and all that can be said on its behalf is that it is the vehicle that legislators have chosen for expressing their hostility to those rights, the burden is undue." *Hope Clinic*, 195 F. 3d, at 881.

CHIEF JUSTICE REHNQUIST, dissenting.

I did not join the joint opinion in *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992), and continue to believe that case is wrongly decided. Despite my disagreement with the opinion, under the rule laid down in *Marks* v. *United States*, 430 U. S. 188, 193 (1977), the *Casey* joint opinion represents the holding of the Court in that case. I believe JUSTICE KENNEDY and JUSTICE THOMAS have correctly applied *Casey*'s principles and join their dissenting opinions.

JUSTICE SCALIA, dissenting.

I am optimistic enough to believe that, one day, *Stenberg v. Carhart* will be assigned its rightful place in the history of this Court's jurisprudence beside *Korematsu* and *Dred Scott.* The method of killing a human child—one cannot even accurately say an entirely unborn human child—proscribed by this statute is so horrible that the most clinical description of it evokes a shudder of revulsion. And the Court must know (as most state legislatures banning this procedure have concluded) that demanding a "health exception"—which requires the abortionist to assure himself that, in his expert medical judgment, this method is, in the case at hand, marginally safer than others (how can one prove the contrary beyond a reasonable doubt?)—is to give live-birth abortion free rein. The notion that the Constitution of the United States, designed, among other things, "to establish Justice, insure domestic Tranquility, . . . and secure the Blessings of Liberty to ourselves and our Posterity," prohibits the States from simply banning this visibly brutal means of eliminating our half-born posterity is quite simply absurd.

Even so, I had not intended to write separately here until the focus of the other separate writings (including the one I have joined) gave me cause to fear that this case might be taken to stand for an error different from the one that it actually exemplifies. Because of the Court's practice of publishing dissents in the order of the seniority of their authors, this writing will appear in the United States Reports before those others, but the reader will not comprehend what follows unless he reads them first.

\* \* \*

The two lengthy dissents in this case have, appropriately enough, set out to establish that today's result does not follow from this Court's most recent pronouncement on the matter of abortion, *Planned Parenthood of Southeastern Pa. v. Casey,* 505 U. S. 833 (1992). It would be unfortunate, how-

ever, if those who disagree with the result were induced to regard it as merely a regrettable misapplication of *Casey*. It is not that, but is *Casey*'s logical and entirely predictable consequence. To be sure, the Court's construction of this statute so as to make it include procedures other than live-birth abortion involves not only a disregard of fair meaning, but an abandonment of the principle that even ambiguous statutes should be interpreted in such fashion as to render them valid rather than void. *Casey* does not permit *that* jurisprudential novelty—which must be chalked up to the Court's inclination to bend the rules when any effort to limit abortion, or even to speak in opposition to abortion, is at issue. It is of a piece, in other words, with *Hill* v. *Colorado*, *ante*, p. 703, also decided today.

But the Court gives a second and independent reason for invalidating this humane (not to say antibarbarian) law: That it fails to allow an exception for the situation in which the abortionist believes that this live-birth method of destroying the child might be safer for the woman. (As pointed out by JUSTICE THOMAS, and elaborated upon by JUSTICE KENNEDY, there is no good reason to believe this is ever the case, but—who knows?—it sometime *might* be.)

I have joined JUSTICE THOMAS's dissent because I agree that today's decision is an "unprecedented expansio[n]" of our prior cases, *post*, at 1012, "is not mandated" by *Casey*'s "undue-burden" test, *post*, at 1010, and can even be called (though this pushes me to the limit of my belief) "obviously irreconcilable with *Casey*'s explication of what its undue-burden standard requires," *post*, at 983. But I never put much stock in *Casey*'s explication of the inexplicable. In the last analysis, my judgment that *Casey* does not support today's tragic result can be traced to the fact that what I consider to be an "undue burden" is different from what the majority considers to be an "undue burden"—a conclusion that cannot be demonstrated true or false by factual inquiry or legal reasoning. It is a value judgment, dependent upon how much one respects (or believes society ought to respect)

the life of a partially delivered fetus, and how much one respects (or believes society ought to respect) the freedom of the woman who gave it life to kill it. Evidently, the five Justices in today's majority value the former less, or the latter more, (or both), than the four of us in dissent. Case closed. There is no cause for anyone who believes in *Casey* to feel betrayed by this outcome. It has been arrived at by precisely the process *Casey* promised—a democratic vote by nine lawyers, not on the question whether the text of the Constitution has anything to say about this subject (it obviously does not); nor even on the question (also appropriate for lawyers) whether the legal traditions of the American people would have sustained such a limitation upon abortion (they obviously would); but upon the pure policy question whether this limitation upon abortion is "undue"—*i. e.,* goes too far.

In my dissent in *Casey,* I wrote that the "undue burden" test made law by the joint opinion created a standard that was "as doubtful in application as it is unprincipled in origin," *Casey,* 505 U. S., at 985; "hopelessly unworkable in practice," *id.,* at 986; "ultimately standardless," *id.,* at 987. Today's decision is the proof. As long as we are debating this issue of necessity for a health-of-the-mother exception on the basis of *Casey,* it is really quite impossible for us dissenters to contend that the majority is *wrong* on the law— any more than it could be said that one is *wrong in law* to support or oppose the death penalty, or to support or oppose mandatory minimum sentences. The most that we can honestly say is that we disagree with the majority on their policy-judgment-couched-as-law. And those who believe that a 5-to-4 vote on a policy matter by unelected lawyers should not overcome the judgment of 30 state legislatures have a problem, not with the *application* of *Casey,* but with its *existence.* *Casey* must be overruled.

While I am in an I-told-you-so mood, I must recall my bemusement, in *Casey,* at the majority opinion's expressed be-

lief that *Roe* v. *Wade*, 410 U. S. 133 (1973), had "call[ed] the contending sides of a national controversy to end their national division by accepting a common mandate rooted in the Constitution," *Casey*, 505 U. S., at 867, and that the decision in *Casey* would ratify that happy truce. It seemed to me, quite to the contrary, that "*Roe* fanned into life an issue that has inflamed our national politics in general, and has obscured with its smoke the selection of Justices to this Court in particular, ever since"; and that, "by keeping us in the abortion-umpiring business, it is the perpetuation of that disruption, rather than of any *Pax Roeana*, that the Court's new majority decrees." *Id.*, at 995–996. Today's decision, that the Constitution of the United States prevents the prohibition of a horrible mode of abortion, will be greeted by a firestorm of criticism—as well it should. I cannot understand why those who *acknowledge* that, in the opening words of JUSTICE O'CONNOR's concurrence, "[t]he issue of abortion is one of the most contentious and controversial in contemporary American society," *ante*, at 947, persist in the belief that this Court, armed with neither constitutional text nor accepted tradition, can resolve that contention and controversy rather than be consumed by it. If only for the sake of its own preservation, the Court should return this matter to the people—where the Constitution, by its silence on the subject, left it—and let *them* decide, State by State, whether this practice should be allowed. *Casey* must be overruled.

JUSTICE KENNEDY, with whom THE CHIEF JUSTICE joins, dissenting.

For close to two decades after *Roe* v. *Wade*, 410 U. S. 113 (1973), the Court gave but slight weight to the interests of the separate States when their legislatures sought to address persisting concerns raised by the existence of a woman's right to elect an abortion in defined circumstances. When the Court reaffirmed the essential holding of *Roe*, a central premise was that the States retain a critical and legitimate

role in legislating on the subject of abortion, as limited by the woman's right the Court restated and again guaranteed. *Planned Parenthood of Southeastern Pa.* v. *Casey*, 505 U. S. 833 (1992). The political processes of the State are not to be foreclosed from enacting laws to promote the life of the unborn and to ensure respect for all human life and its potential. *Id.*, at 871 (plurality opinion). The State's constitutional authority is a vital means for citizens to address these grave and serious issues, as they must if we are to progress in knowledge and understanding and in the attainment of some degree of consensus.

The Court's decision today, in my submission, repudiates this understanding by invalidating a statute advancing critical state interests, even though the law denies no woman the right to choose an abortion and places no undue burden upon the right. The legislation is well within the State's competence to enact. Having concluded Nebraska's law survives the scrutiny dictated by a proper understanding of *Casey*, I dissent from the judgment invalidating it.

I

The Court's failure to accord any weight to Nebraska's interest in prohibiting partial birth abortion is erroneous and undermines its discussion and holding. The Court's approach in this regard is revealed by its description of the abortion methods at issue, which the Court is correct to describe as "clinically cold or callous." *Ante*, at 923. The majority views the procedures from the perspective of the abortionist, rather than from the perspective of a society shocked when confronted with a new method of ending human life. Words invoked by the majority, such as "transcervical procedures," "[o]smotic dilators," "instrumental disarticulation," and "paracervical block," may be accurate and are to some extent necessary, *ante*, at 924–925; but for citizens who seek to know why laws on this subject have been enacted across the Nation, the words are insufficient. Repeated references

to sources understandable only to a trained physician may obscure matters for persons not trained in medical terminology. Thus it seems necessary at the outset to set forth what may happen during an abortion.

The person challenging Nebraska's law is Dr. Leroy Carhart, a physician who received his medical degree from Hahnemann Hospital and University in 1973. App. 29. Dr. Carhart performs the procedures in a clinic in Nebraska, *id.*, at 30, and will also travel to Ohio to perform abortions there, *id.*, at 86. Dr. Carhart has no specialty certifications in a field related to childbirth or abortion and lacks admitting privileges at any hospital. *Id.*, at 82, 83. He performs abortions throughout pregnancy, including when he is unsure whether the fetus is viable. *Id.*, at 116. In contrast to the physicians who provided expert testimony in this case (who are board certified instructors at leading medical education institutions and members of the American Board of Obstetricians and Gynecologists), Dr. Carhart performs the partial birth abortion procedure (D&X) that Nebraska seeks to ban. He also performs the other method of abortion at issue in the case, the D&E.

As described by Dr. Carhart, the D&E procedure requires the abortionist to use instruments to grasp a portion (such as a foot or hand) of a developed and living fetus and drag the grasped portion out of the uterus into the vagina. *Id.*, at 61. Dr. Carhart uses the traction created by the opening between the uterus and vagina to dismember the fetus, tearing the grasped portion away from the remainder of the body. *Ibid.* The traction between the uterus and vagina is essential to the procedure because attempting to abort a fetus without using that traction is described by Dr. Carhart as "pulling the cat's tail" or "drag[ging] a string across the floor, you'll just keep dragging it. It's not until something grabs the other end that you are going to develop traction." *Id.*, at 62. The fetus, in many cases, dies just as a human adult or child would: It bleeds to death as it is torn limb from

limb. *Id.*, at 63. The fetus can be alive at the beginning of the dismemberment process and can survive for a time while its limbs are being torn off. Dr. Carhart agreed that "[w]hen you pull out a piece of the fetus, let's say, an arm or a leg and remove that, at the time just prior to removal of the portion of the fetus, . . . the fetus [is] alive." *Id.*, at 62. Dr. Carhart has observed fetal heartbeat via ultrasound with "extensive parts of the fetus removed," *id.*, at 64, and testified that mere dismemberment of a limb does not always cause death because he knows of a physician who removed the arm of a fetus only to have the fetus go on to be born "as a living child with one arm." *Id.*, at 63. At the conclusion of a D&E abortion no intact fetus remains. In Dr. Carhart's words, the abortionist is left with "a tray full of pieces." *Id.*, at 125.

The other procedure implicated today is called "partial birth abortion" or the D&X. The D&X can be used, as a general matter, after 19 weeks' gestation because the fetus has become so developed that it may survive intact partial delivery from the uterus into the vagina. *Id.*, at 61. In the D&X, the abortionist initiates the woman's natural delivery process by causing the cervix of the woman to be dilated, sometimes over a sequence of days. *Id.*, at 492. The fetus' arms and legs are delivered outside the uterus while the fetus is alive; witnesses to the procedure report seeing the body of the fetus moving outside the woman's body. Brief for Petitioners 4. At this point, the abortion procedure has the appearance of a live birth. As stated by one group of physicians, "[a]s the physician manually performs breech extraction of the body of a live fetus, excepting the head, she continues in the apparent role of an obstetrician delivering a child." Brief for Association of American Physicians and Surgeons et al. as *Amici Curiae* 27. With only the head of the fetus remaining in utero, the abortionist tears open the skull. According to Dr. Martin Haskell, a leading proponent of the procedure, the appropriate instrument to be used at

this stage of the abortion is a pair of scissors. M. Haskell, Dilation and Extraction for Late Second Trimester Abortion (1992), in 139 Cong. Rec. 8605 (1993). Witnesses report observing the portion of the fetus outside the woman react to the skull penetration. Brief for Petitioners 4. The abortionist then inserts a suction tube and vacuums out the developing brain and other matter found within the skull. The process of making the size of the fetus' head smaller is given the clinically neutral term "reduction procedure." 11 F. Supp. 2d 1099, 1106 (Neb. 1998). Brain death does not occur until after the skull invasion, and, according to Dr. Carhart, the heart of the fetus may continue to beat for minutes after the contents of the skull are vacuumed out. App. 58. The abortionist next completes the delivery of a dead fetus, intact except for the damage to the head and the missing contents of the skull.

Of the two described procedures, Nebraska seeks only to ban the D&X. In light of the description of the D&X procedure, it should go without saying that Nebraska's ban on partial birth abortion furthers purposes States are entitled to pursue. Dr. Carhart nevertheless maintains the State has no legitimate interest in forbidding the D&X. As he interprets the controlling cases in this Court, the only two interests the State may advance through regulation of abortion are in the health of the woman who is considering the procedure and in the life of the fetus she carries. Brief for Respondent 45. The Court, as I read its opinion, accedes to his views, misunderstanding *Casey* and the authorities it confirmed.

*Casey* held that cases decided in the wake of *Roe* v. *Wade*, 410 U. S. 113 (1973), had "given [state interests] too little acknowledgment and implementation." 505 U. S., at 871 (plurality opinion). The decision turned aside any contention that a person has the "right to decide whether to have an abortion without 'interference from the State,'" *id.*, at 875, and rejected a strict scrutiny standard of review as "in-

compatible with the recognition that there is a substantial state interest in potential life throughout pregnancy." *Id.,* at 876. "The very notion that the State has a substantial interest in potential life leads to the conclusion that not all regulations must be deemed unwarranted." *Ibid.* We held it was inappropriate for the Judicial Branch to provide an exhaustive list of state interests implicated by abortion. *Id.,* at 877.

*Casey* is premised on the States having an important constitutional role in defining their interests in the abortion debate. It is only with this principle in mind that Nebraska's interests can be given proper weight. The State's brief describes its interests as including concern for the life of the unborn and "for the partially-born," in preserving the integrity of the medical profession, and in "erecting a barrier to infanticide." Brief for Petitioners 48–49. A review of *Casey* demonstrates the legitimacy of these policies. The Court should say so.

States may take sides in the abortion debate and come down on the side of life, even life in the unborn:

> "Even in the earliest stages of pregnancy, the State may enact rules and regulations designed to encourage [a woman] to know that there are philosophic and social arguments of great weight that can be brought to bear in favor of continuing the pregnancy to full term and that there are procedures and institutions to allow adoption of unwanted children as well as a certain degree of state assistance if the mother chooses to raise the child herself." 505 U. S., at 872 (plurality opinion).

States also have an interest in forbidding medical procedures which, in the State's reasonable determination, might cause the medical profession or society as a whole to become insensitive, even disdainful, to life, including life in the human fetus. Abortion, *Casey* held, has consequences beyond the woman and her fetus. The States' interests in reg-

ulating are of concomitant extension. *Casey* recognized that abortion is "fraught with consequences for . . . the persons who perform and assist in the procedure [and for] society which must confront the knowledge that these procedures exist, procedures some deem nothing short of an act of violence against innocent human life." *Id.*, at 852 (majority opinion).

A State may take measures to ensure the medical profession and its members are viewed as healers, sustained by a compassionate and rigorous ethic and cognizant of the dignity and value of human life, even life which cannot survive without the assistance of others. *Ibid.; Washington* v. *Glucksberg*, 521 U. S. 702, 730–734 (1997).

*Casey* demonstrates that the interests asserted by the State are legitimate and recognized by law. It is argued, however, that a ban on the D&X does not further these interests. This is because, the reasoning continues, the D&E method, which Nebraska claims to be beyond its intent to regulate, can still be used to abort a fetus and is no less dehumanizing than the D&X method. While not adopting the argument in express terms, the Court indicates tacit approval of it by refusing to reject it in a forthright manner. Rendering express what is only implicit in the majority opinion, JUSTICE STEVENS and JUSTICE GINSBURG are forthright in declaring that the two procedures are indistinguishable and that Nebraska has acted both irrationally and without a proper purpose in enacting the law. The issue is not whether members of the judiciary can see a difference between the two procedures. It is whether Nebraska can. The Court's refusal to recognize Nebraska's right to declare a moral difference between the procedures is a dispiriting disclosure of the illogic and illegitimacy of the Court's approach to the entire case.

Nebraska was entitled to find the existence of a consequential moral difference between the procedures. We are referred to substantial medical authority that D&X perverts

the natural birth process to a greater degree than D&E, commandeering the live birth process until the skull is pierced. American Medical Association (AMA) publications describe the D&X abortion method as "ethically wrong." AMA Board of Trustees Factsheet on HR 1122 (June 1997), in App. to Brief for Association of American Physicians and Surgeons et al. as *Amici Curiae* 1 (AMA Factsheet). The D&X differs from the D&E because in the D&X the fetus is "killed *outside* of the womb" where the fetus has "an autonomy which separates it from the right of the woman to choose treatments for her own body." *Ibid.;* see also App. 639–640; Brief for Association of American Physicians and Surgeons et al. as *Amici Curiae* 27 ("Intact D&X is aberrant and troubling because the technique confuses the disparate role of a physician in childbirth and abortion in such a way as to blur the medical, legal, and ethical line between infanticide and abortion"). Witnesses to the procedure relate that the fingers and feet of the fetus are moving prior to the piercing of the skull; when the scissors are inserted in the back of the head, the fetus' body, wholly outside the woman's body and alive, reacts as though startled and goes limp. D&X's stronger resemblance to infanticide means Nebraska could conclude the procedure presents a greater risk of disrespect for life and a consequent greater risk to the profession and society, which depend for their sustenance upon reciprocal recognition of dignity and respect. The Court is without authority to second-guess this conclusion.

Those who oppose abortion would agree, indeed would insist, that both procedures are subject to the most severe moral condemnation, condemnation reserved for the most repulsive human conduct. This is not inconsistent, however, with the further proposition that as an ethical and moral matter D&X is distinct from D&E and is a more serious concern for medical ethics and the morality of the larger society the medical profession must serve. Nebraska must obey the legal regime which has declared the right of the woman to

have an abortion before viability. Yet it retains its power to adopt regulations which do not impose an undue burden on the woman's right. By its regulation, Nebraska instructs all participants in the abortion process, including the mother, of its moral judgment that all life, including the life of the unborn, is to be respected. The participants, Nebraska has determined, cannot be indifferent to the procedure used and must refrain from using the natural delivery process to kill the fetus. The differentiation between the procedures is itself a moral statement, serving to promote respect for human life; and if the woman and her physician in contemplating the moral consequences of the prohibited procedure conclude that grave moral consequences pertain to the permitted abortion process as well, the choice to elect or not to elect abortion is more informed; and the policy of promoting respect for life is advanced.

It ill-serves the Court, its institutional position, and the constitutional sources it seeks to invoke to refuse to issue a forthright affirmation of Nebraska's right to declare that critical moral differences exist between the two procedures. The natural birth process has been appropriated; yet the Court refuses to hear the State's voice in defining its interests in its law. The Court's holding contradicts *Casey*'s assurance that the State's constitutional position in the realm of promoting respect for life is more than marginal.

## II

Demonstrating a further and basic misunderstanding of *Casey*, the Court holds the ban on the D&X procedure fails because it does not include an exception permitting an abortionist to perform a D&X whenever he believes it will best preserve the health of the woman. Casting aside the views of distinguished physicians and the statements of leading medical organizations, the Court awards each physician a veto power over the State's judgment that the procedures should not be performed. Dr. Carhart has made the medical

judgment to use the D&X procedure in every case, regardless of indications, after 15 weeks' gestation. 11 F. Supp. 2d, at 1105. Requiring Nebraska to defer to Dr. Carhart's judgment is no different from forbidding Nebraska from enacting a ban at all; for it is now Dr. Leroy Carhart who sets abortion policy for the State of Nebraska, not the legislature or the people. *Casey* does not give precedence to the views of a single physician or a group of physicians regarding the relative safety of a particular procedure.

I am in full agreement with JUSTICE THOMAS that the appropriate *Casey* inquiry is not, as the Court would have it, whether the State is preventing an abortionist from doing something that, in his medical judgment, he believes to be the most appropriate course of treatment. *Post*, at 1009–1013. *Casey* addressed the question "whether the State can resolve . . . philosophic questions [about abortion] in such a definitive way that a woman lacks all choice in the matter." 505 U. S., at 850. We decided the issue against the State, holding that a woman cannot be deprived of the opportunity to make reproductive decisions. *Id.*, at 860. *Casey* made it quite evident, however, that the State has substantial concerns for childbirth and the life of the unborn and may enact laws "which in no real sense depriv[e] women of the ultimate decision." *Id.*, at 875 (plurality opinion). Laws having the "purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus" are prohibited. *Id.*, at 877. Nebraska's law does not have this purpose or effect.

The holding of *Casey*, allowing a woman to elect abortion in defined circumstances, is not in question here. Nebraska, however, was entitled to conclude that its ban, while advancing important interests regarding the sanctity of life, deprived no woman of a safe abortion and therefore did not impose a substantial obstacle on the rights of any woman. The American College of Obstetricians and Gynecologists (ACOG) "could identify no circumstances under which [D&X]

would be the only option to save the life or preserve the health of the woman." App. 600–601. The AMA agrees, stating the "AMA's expert panel, which included an ACOG representative, could not find 'any' identified circumstance where it was 'the only appropriate alternative.'" AMA Factsheet 1. The Court's conclusion that the D&X is the safest method requires it to replace the words "may be" with the word "is" in the following sentence from ACOG's position statement: "An intact D&X, however, may be the best or most appropriate procedure in a particular circumstance." App. 600–601.

No studies support the contention that the D&X abortion method is safer than other abortion methods. Brief for Respondent 36, n. 41. Leading proponents of the procedure acknowledge that the D&X has "disadvantages" versus other methods because it requires a high degree of surgical skill to pierce the skull with a sharp instrument in a blind procedure. Haskell, 139 Cong. Rec. 8605 (1993). Other doctors point to complications that may arise from the D&X. Brief for American Physicians and Surgeons et al. as *Amici Curiae* 21–23; App. 186. A leading physician, Frank Boehm, M. D., who has performed and supervised abortions as director of the Fetal Intensive Care Unit and the Maternal/Fetal Medicine Division at Vanderbilt University Hospital, has refused to support use of the D&X, both because no medical need for the procedure exists and because of ethical concerns. *Id.*, at 636, 639–640, 656–657. Dr. Boehm, a fellow of ACOG, *id.*, at 565, supports abortion rights and has provided sworn testimony in opposition to previous state attempts to regulate abortion. *Id.*, at 608–614.

The Court cannot conclude the D&X is part of standard medical practice. It is telling that no expert called by Dr. Carhart, and no expert testifying in favor of the procedure, had in fact performed a partial birth abortion in his or her medical practice. *E. g., id.*, at 308 (testimony of Dr. Phillip Stubblefield). In this respect their opinions were

courtroom conversions of uncertain reliability. Litigation in other jurisdictions establishes that physicians do not adopt the D&X procedure as part of standard medical practice. *E. g., Richmond Medical Center for Women* v. *Gilmore,* 144 F. 3d 326, 328 (CA4 1998); *Hope Clinic* v. *Ryan,* 195 F. 3d 857, 871 (CA7 1999); see also App. 603–604. It is quite wrong for the Court to conclude, as it seems to have done here, that Dr. Carhart conforms his practice to the proper standard of care because he has incorporated the procedure into his practice. Neither Dr. Boehm nor Dr. Carhart's lead expert, Dr. Stubblefield (the chairman of the Department of Obstetrics and Gynecology at Boston University School of Medicine and director of obstetrics and gynecology for the Boston Medical Center), has done so.

Substantial evidence supports Nebraska's conclusion that its law denies no woman a safe abortion. The most to be said for the D&X is it may present an unquantified lower risk of complication for a particular patient but that other proven safe procedures remain available even for this patient. Under these circumstances, the Court is wrong to limit its inquiry to the relative physical safety of the two procedures, with the slightest potential difference requiring the invalidation of the law. As JUSTICE O'CONNOR explained in an earlier case, the State may regulate based on matters beyond "what various medical organizations have to say about the *physical* safety of a particular procedure." *Akron* v. *Akron Center for Reproductive Health, Inc.,* 462 U. S. 416, 467 (1983) (dissenting opinion). Where the difference in physical safety is, at best, marginal, the State may take into account the grave moral issues presented by a new abortion method. See *Casey,* 505 U. S., at 880 (requiring a regulation to impose a "significant threat to the life or health of a woman" before its application would impose an undue burden (internal quotation marks omitted)). Dr. Carhart does not decide to use the D&X based on a conclusion that it is best for a particular woman. Unsubstantiated and gen-

eralized health differences which are, at best, marginal, do not amount to a substantial obstacle to the abortion right. *Id.*, at 874, 876 (plurality opinion). It is also important to recognize that the D&X is effective only when the fetus is close to viable or, in fact, viable; thus the State is regulating the process at the point where its interest in life is nearing its peak.

Courts are ill-equipped to evaluate the relative worth of particular surgical procedures. The legislatures of the several States have superior factfinding capabilities in this regard. In an earlier case, JUSTICE O'CONNOR had explained that the general rule extends to abortion cases, writing that the Court is not suited to be "the Nation's *ex officio* medical board with powers to approve or disapprove medical and operative practices and standards throughout the United States." 462 U. S., at 456 (dissenting opinion) (internal quotation marks omitted). "Irrespective of the difficulty of the task, legislatures, with their superior factfinding capabilities, are certainly better able to make the necessary judgments than are courts." *Id.*, at 456, n. 4. Nebraska's judgment here must stand.

In deferring to the physician's judgment, the Court turns back to cases decided in the wake of *Roe*, cases which gave a physician's treatment decisions controlling weight. Before it was repudiated by *Casey*, the approach of deferring to physicians had reached its apex in *Akron, supra,* where the Court held an informed consent requirement was unconstitutional. The law challenged in *Akron* required the abortionist to inform the woman of the status of her pregnancy, the development of her fetus, the date of possible viability, the physical and emotional complications that may result from an abortion, and the availability of agencies to provide assistance and information. *Id.*, at 442. The physician was also required to advise the woman of the risks associated with the abortion technique to be employed and other information. *Ibid.* The law was invalidated based on the physi-

cian's right to practice medicine in the way he or she saw fit; for, according to the *Akron* Court, "[i]t remains primarily the responsibility of the physician to ensure that appropriate information is conveyed to his patient, depending on her particular circumstances." *Id.,* at 443. Dispositive for the Court was that the law was an "intrusion upon the discretion of the pregnant woman's physician." *Id.,* at 445. The physician was placed in an "undesired and uncomfortable straitjacket." *Ibid.* (internal quotation marks omitted). The Court's decision today echoes the *Akron* Court's deference to a physician's right to practice medicine in the way he or she sees fit.

The Court, of course, does not wish to cite *Akron;* yet the Court's holding is indistinguishable from the reasoning in *Akron* that *Casey* repudiated. No doubt exists that today's holding is based on a physician-first view which finds its primary support in that now-discredited case. Rather than exalting the right of a physician to practice medicine with unfettered discretion, *Casey* recognized: "Whatever constitutional status the doctor-patient relation may have as a general matter, in the present context it is derivative of the woman's position." 505 U. S., at 884 (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.). *Casey* discussed the informed consent requirement struck down in *Akron* and held *Akron* was wrong. The doctor-patient relation was only "entitled to the same solicitude it receives in other contexts." 505 U. S., at 884. The standard of medical practice cannot depend on the individual views of Dr. Carhart and his supporters. The question here is whether there was substantial and objective medical evidence to demonstrate the State had considerable support for its conclusion that the ban created a substantial risk to no woman's health. *Casey* recognized the point, holding the physician's ability to practice medicine was "subject to reasonable . . . regulation by the State" and would receive the "same solicitude it receives in other contexts." *Ibid.* In other contexts, the State is enti-

tled to make judgments where high medical authority is in disagreement.

The Court fails to acknowledge substantial authority allowing the State to take sides in a medical debate, even when fundamental liberty interests are at stake and even when leading members of the profession disagree with the conclusions drawn by the legislature. In *Kansas* v. *Hendricks*, 521 U. S. 346 (1997), we held that disagreements among medical professionals "do not tie the State's hands in setting the bounds of . . . laws. In fact, it is precisely where such disagreement exists that legislatures have been afforded the widest latitude." *Id.*, at 360, n. 3. Instead, courts must exercise caution (rather than require deference to the physician's treatment decision) when medical uncertainty is present. *Ibid.* ("[W]hen a legislature 'undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad and courts should be cautious not to rewrite legislation'") (quoting *Jones* v. *United States*, 463 U. S. 354, 370 (1983)); see also *Collins* v. *Texas*, 223 U. S. 288, 297–298 (1912) (Holmes, J.) (declaring the "right of the state to adopt a policy even upon medical matters concerning which there is difference of opinion and dispute"); *Lambert* v. *Yellowley*, 272 U. S. 581, 596–597 (1926) (rejecting claim of distinguished physician because "[h]igh medical authority being in conflict . . . , it would, indeed, be strange if Congress lacked the power [to act]"); *Marshall* v. *United States*, 414 U. S. 417, 427 (1974) (recognizing "there is no agreement among members of the medical profession" (internal quotation marks omitted)); *United States* v. *Rutherford*, 442 U. S. 544 (1979) (discussing regulatory approval process for certain drugs).

Instructive is *Jacobson* v. *Massachusetts*, 197 U. S. 11 (1905), where the defendant was convicted because he refused to undergo a smallpox vaccination. The defendant claimed the mandatory vaccination violated his liberty to "care for his own body and health in such way as to him

seems best." *Id.*, at 26. He offered to prove that members of the medical profession took the position that the vaccination was of no value and, in fact, was harmful. *Id.*, at 30. The Court rejected the claim, establishing beyond doubt the right of the legislature to resolve matters upon which physicians disagreed:

> "Those offers [of proof by the defendant] in the main seem to have had no purpose except to state the general theory of those of the medical profession who attach little or no value to vaccination as a means of preventing the spread of smallpox, or who think that vaccination causes other diseases of the body. What everybody knows the court must know, and therefore the state court judicially knew, as this court knows, that an opposite theory accords with the common belief, and is maintained by high medical authority. We must assume that, when the statute in question was passed, the legislature of Massachusetts was not unaware of these opposing theories, and was compelled, of necessity, to choose between them. It was not compelled to commit a matter involving the public health and safety to the final decision of a court or jury. It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease. That was for the legislative department to determine in the light of all the information it had or could obtain. It could not properly abdicate its function to guard the public health and safety." *Ibid.*

The *Jacobson* Court quoted with approval a recent state-court decision which observed, in words having full application today:

> "The fact that the belief is not universal [in the medical community] is not controlling, for there is scarcely any belief that is accepted by everyone. The possibility that

the belief may be wrong, and that science may yet show it to be wrong, is not conclusive; for the legislature has the right to pass laws which, according to common belief of the people, are adapted to [address medical matters]. In a free country, where government is by the people, through their chosen representatives, practical legislation admits of no other standard of action.'" *Id.*, at 35 (quoting *Viemester* v. *White*, 179 N. Y. 235, 241, 72 N. E. 97, 99 (1904)).

JUSTICE O'CONNOR assures the people of Nebraska they are free to redraft the law to include an exception permitting the D&X to be performed when "the procedure, in appropriate medical judgment, is necessary to preserve the health of the mother." *Ante*, at 951. The assurance is meaningless. She has joined an opinion which accepts that Dr. Carhart exercises "appropriate medical judgment" in using the D&X for every patient in every procedure, regardless of indications, after 15 weeks' gestation. *Ante*, at 937 (requiring any health exception to "tolerate responsible differences of medical opinion" which "are present here"). A ban which depends on the "appropriate medical judgment" of Dr. Carhart is no ban at all. He will be unaffected by any new legislation. This, of course, is the vice of a health exception resting in the physician's discretion.

In light of divided medical opinion on the propriety of the partial birth abortion technique (both in terms of physical safety and ethical practice) and the vital interests asserted by Nebraska in its law, one is left to ask what the first Justice Harlan asked: "Upon what sound principles as to the relations existing between the different departments of government can the court review this action of the legislature?" *Jacobson, supra*, at 31. The answer is none.

III

The Court's next holding is that Nebraska's ban forbids both the D&X procedure and the more common D&E proce-

dure. In so ruling the Court misapplies settled doctrines of statutory construction and contradicts *Casey*'s premise that the States have a vital constitutional position in the abortion debate. I agree with the careful statutory analysis conducted by JUSTICE THOMAS, *post*, at 989–1005. Like the ruling requiring a physician veto, requiring a State to meet unattainable standards of statutory draftsmanship in order to have its voice heard on this grave and difficult subject is no different from foreclosing state participation altogether.

Nebraska's statute provides:

> "No partial birth abortion shall be performed in this state unless such procedure is necessary to save the life of the mother whose life is endangered by a physical disorder, physical illness, or physical injury, including a life-endangering physical condition caused by or arising from the pregnancy itself." Neb. Rev. Stat. Ann. § 28–328(1) (Supp. 1999).

The statute defines "partial birth abortion" as

> "an abortion procedure in which the person performing the abortion partially delivers vaginally a living unborn child before killing the unborn child and completing the delivery." § 28–326(9).

It further defines "partially delivers vaginally a living unborn child before killing the unborn child" to mean

> "deliberately and intentionally delivering into the vagina a living unborn child, or a substantial portion thereof, for the purpose of performing a procedure that the person performing such procedure knows will kill the unborn child and does kill the unborn child." *Ibid.*

The text demonstrates the law applies only to the D&X procedure. Nebraska's intention is demonstrated at three points in the statutory language: references to "partial-birth abortion" and to the "delivery" of a fetus; and the require-

ment that the delivery occur "before" the performance of the death-causing procedure.

The term "partial birth abortion" means an abortion performed using the D&X method as described above. The Court of Appeals acknowledged the term "is commonly understood to refer to a particular procedure known as intact dilation and extraction (D&X)." *Little Rock Family Planning Servs.* v. *Jegley*, 192 F. 3d 794, 795 (CA8 1999). Dr. Carhart's own lead expert, Dr. Phillip Stubblefield, prefaced his description of the D&X procedure by describing it as the procedure "which, in the lay press, has been called a partial-birth abortion." App. 271–272. And the AMA has declared: "The 'partial birth abortion' legislation is by its very name aimed exclusively [at the D&X.] There is no other abortion procedure which could be confused with that description." AMA Factsheet 3. A commonsense understanding of the statute's reference to "partial-birth abortion" demonstrates its intended reach and provides all citizens the fair warning required by the law. *McBoyle* v. *United States*, 283 U. S. 25, 27 (1931).

The statute's intended scope is demonstrated by its requirement that the banned procedure include a partial "delivery" of the fetus into the vagina and the completion of a "delivery" at the end of the procedure. Only removal of an intact fetus can be described as a "delivery" of a fetus and only the D&X involves an intact fetus. In a D&E, portions of the fetus are pulled into the vagina with the intention of dismembering the fetus by using the traction at the opening between the uterus and vagina. This cannot be considered a delivery of a portion of a fetus. In Dr. Carhart's own words, the D&E leaves the abortionist with a "tray full of pieces," App. 125, at the end of the procedure. Even if it could be argued, as the majority does, *ante*, at 944, that dragging a portion of an intact fetus into the vagina as the first step of a D&E is a delivery of that portion of an intact fetus, the D&E still does not involve "completing the deliv-

ery" of an intact fetus. Whatever the statutory term "completing the delivery" of an unborn child means, it cannot mean, as the Court would have it, placing fetal remains on a tray. See *Planned Parenthood of Wis.* v. *Doyle*, 9 F. Supp. 2d 1033, 1041 (WD Wis. 1998) (the statute is "readily applied to the partial delivery of an intact child but hardly applicable to the delivery of dismembered body parts").

Medical descriptions of the abortion procedures confirm the point, for it is only the description of the D&X that invokes the word "delivery." App. 600. The United States, as *amicus*, cannot bring itself to describe the D&E as involving a "delivery," instead substituting the word "emerges" to describe how the fetus is brought into the vagina in a D&E. Brief for United States as *Amicus Curiae* 10. The Court, in a similar admission, uses the words "a physician pulling" a portion of a fetus, *ante*, at 939, rather than a "physician delivering" a portion of a fetus; yet only a procedure involving a delivery is banned by the law. Of all the definitions of "delivery" provided by the Court, *ante*, at 944, not one supports (or, more important for statutory construction purposes, requires) the conclusion that the statutory term "completing the delivery" refers to the placement of dismembered body parts on a tray rather than the removal of an intact fetus from the woman's body.

The operation of Nebraska's law is further defined by the requirement that the fetus be partially delivered into the vagina "before" the abortionist kills it. The partial delivery must be undertaken "for the purpose of performing a procedure that the person . . . knows will kill the unborn child." Neb. Rev. Stat. Ann. §28–326(9) (Supp. 1999). The law is most naturally read to require the death of the fetus to take place in two steps: First the fetus must be partially delivered into the vagina and then the defendant must perform a death-causing procedure. In a D&E, forcing the fetus into the vagina (the pulling of extremities off the body in the process of extracting the body parts from the uterus into the

vagina) is also the procedure that kills the fetus. *Richmond Medical Center for Women* v. *Gilmore,* 144 F. 3d, at 330 (order of Luttig, J.). In a D&X, the fetus is partially delivered into the vagina before a separate procedure (the so-called "reduction procedure") is performed in order to kill the fetus.

The majority rejects this argument based on its conclusion that the word "procedure" must "refer to an entire abortion procedure" each time it is used. *Ante,* at 944. This interpretation makes no sense. It would require us to conclude that the Nebraska Legislature considered the "entire abortion procedure" to take place after the abortionist has already delivered into the vagina a living unborn child, or a substantial portion thereof. Neb. Rev. Stat. Ann. § 28–326(9) (Supp. 1999). All medical authorities agree, however, that the entire abortion procedure begins several days before this stage, with the dilation of the cervix. The majority asks us, in effect, to replace the words "for the purpose of performing" with the words "in the course of performing" in the portion of § 28–326(9) quoted in the preceding paragraph. The reference to "procedure" refers to the separate death-causing procedure that is unique to the D&X.

In light of the statutory text, the commonsense understanding must be that the statute covers only the D&X. See *Broadrick* v. *Oklahoma,* 413 U. S. 601, 698 (1973). The AMA does not disagree. It writes: "The partial birth abortion legislation is by its very name aimed exclusively at a procedure by which a living fetus is intentionally and deliberately given partial birth and delivered for the purpose of killing it. There is no other abortion procedure which could be confused with that description." AMA Factsheet 3 (internal quotation marks omitted). *Casey* disavows strict scrutiny review; and Nebraska must be afforded leeway when attempting to regulate the medical profession. See *Kansas* v. *Hendricks,* 521 U. S., at 359 ("[W]e have traditionally left to legislators the task of defining terms of a medical

nature that have legal significance"). To hold the statute covers the D&E, the Court must disagree with the AMA and disregard the known intent of the legislature, adequately expressed in the statute.

Strained statutory constructions in abortion cases are not new, for JUSTICE O'CONNOR identified years ago "an unprecedented canon of construction under which in cases involving abortion, a permissible reading of a statute is to be avoided at all costs." *Thornburgh* v. *American College of Obstetricians and Gynecologists,* 476 U. S. 747, 829 (1986) (dissenting opinion) (internal quotation marks omitted). *Casey* banished this doctrine from our jurisprudence; yet the Court today reinvigorates it and, in the process, ignores its obligation to interpret the law in a manner to validate it, not render it void. *E. g., Johnson* v. *Robison,* 415 U. S. 361, 366–367 (1974); *Edward J. DeBartolo Corp.* v. *Florida Gulf Coast Building & Constr. Trades Council,* 485 U. S. 568, 575 (1988). Avoidance of unconstitutional constructions is discussed only in two sentences of the Court's analysis and dismissed as inapplicable because the statute is not susceptible to the construction offered by the Nebraska Attorney General. *Ante,* at 944–945. For the reasons here discussed, the statute is susceptible to the construction; and the Court is required to adopt it.

The Court and JUSTICE O'CONNOR seek to shield themselves from criticism by citing the interpretations of the partial birth abortion statutes offered by some other federal courts. *Ante,* at 941–942. On this issue of nationwide importance, these courts have no special competence; and of appellate courts to consider similar statutes, a majority have, in contrast to the Court, declared that the law could be interpreted to cover only the D&X. See *Hope Clinic,* 195 F. 3d, at 865–871; *Richmond Medical Center, supra,* at 330–332 (order of Luttig, J.). Thirty States have enacted similar laws. It is an abdication of responsibility for the Court to suggest its hands are tied by decisions which paid scant at-

tention to *Casey*'s recognition of the State's authority and misapplied the doctrine of construing statutes to avoid constitutional difficulty. Further, the leading case describing the deference argument, *Frisby* v. *Schultz*, 487 U. S. 474, 483 (1988), declined to defer to a lower court construction of the state statute at issue in the case. As *Frisby* observed, the "lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties." See also *Webster* v. *Reproductive Health Services*, 492 U. S. 490, 514 (1989) (opinion of REHNQUIST, C. J.); *id.*, at 525 (O'CONNOR, J., concurring in part and concurring in judgment).

The majority and, even more so, the concurring opinion by JUSTICE O'CONNOR, ignore the settled rule against deciding unnecessary constitutional questions. The State of Nebraska conceded, under its understanding of *Casey*, that if this law must be interpreted to bar D&E as well as D&X it is unconstitutional. Since the majority concludes this is indeed the case, that should have been the end of the matter. Yet the Court and JUSTICE O'CONNOR go much further. They conclude that the statute requires a health exception which, for all practical purposes and certainly in the circumstances of this case, allows the physician to make the determination in his own professional judgment. This is an immense constitutional holding. It is unnecessary; and, for the reasons I have sought to explain, it is incorrect. While it is not clear which of the two halves of the majority opinion is *dictum*, both are wrong.

The United States District Court in this case leaped to prevent the law from being enforced, granting an injunction before it was applied or interpreted by Nebraska. Cf. *Hill* v. *Colorado, ante,* p. 703. In so doing, the court excluded from the abortion debate not just the Nebraska legislative branch but the State's executive and judiciary as well. The law was enjoined before the chief law enforcement officer

of the State, its Attorney General, had any opportunity to interpret it. The federal court then ignored the representations made by that officer during this litigation. In like manner, Nebraska's courts will be given no opportunity to define the contours of the law, although by all indications those courts would give the statute a more narrow construction than the one so eagerly adopted by the Court today. *E. g., Stenberg* v. *Moore,* 258 Neb. 199, 206, 602 N. W. 2d 465, 472 (1995). Thus the court denied each branch of Nebraska's government any role in the interpretation or enforcement of the statute. This cannot be what *Casey* meant when it said we would be more solicitous of state attempts to vindicate interests related to abortion. *Casey* did not assume this state of affairs.

IV

Ignoring substantial medical and ethical opinion, the Court substitutes its own judgment for the judgment of Nebraska and some 30 other States and sweeps the law away. The Court's holding stems from misunderstanding the record, misinterpretation of *Casey,* outright refusal to respect the law of a State, and statutory construction in conflict with settled rules. The decision nullifies a law expressing the will of the people of Nebraska that medical procedures must be governed by moral principles having their foundation in the intrinsic value of human life, including the life of the unborn. Through their law the people of Nebraska were forthright in confronting an issue of immense moral consequence. The State chose to forbid a procedure many decent and civilized people find so abhorrent as to be among the most serious of crimes against human life, while the State still protected the woman's autonomous right of choice as reaffirmed in *Casey.* The Court closes its eyes to these profound concerns.

From the decision, the reasoning, and the judgment, I dissent.

JUSTICE THOMAS, with whom THE CHIEF JUSTICE and JUSTICE SCALIA join, dissenting.

In 1973, this Court struck down an Act of the Texas Legislature that had been in effect since 1857, thereby rendering unconstitutional abortion statutes in dozens of States. *Roe* v. *Wade*, 410 U. S. 113, 119. As some of my colleagues on the Court, past and present, ably demonstrated, that decision was grievously wrong. See, *e. g., Doe* v. *Bolton*, 410 U. S. 179, 221–223 (1973) (White, J., dissenting); *Roe* v. *Wade, supra,* at 171–178 (REHNQUIST, J., dissenting). Abortion is a unique act, in which a woman's exercise of control over her own body ends, depending on one's view, human life or potential human life. Nothing in our Federal Constitution deprives the people of this country of the right to determine whether the consequences of abortion to the fetus and to society outweigh the burden of an unwanted pregnancy on the mother. Although a State *may* permit abortion, nothing in the Constitution dictates that a State *must* do so.

In the years following *Roe*, this Court applied, and, worse, extended, that decision to strike down numerous state statutes that purportedly threatened a woman's ability to obtain an abortion. The Court voided parental consent laws, see *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52, 75 (1976), legislation requiring that second-trimester abortions take place in hospitals, see *Akron* v. *Akron Center for Reproductive Health, Inc.*, 462 U. S. 416, 431 (1983), and even a requirement that both parents of a minor be notified before their child has an abortion, see *Hodgson* v. *Minnesota*, 497 U. S. 417, 455 (1990). It was only a slight exaggeration when this Court described, in 1976, a right to abortion "without interference from the State." *Danforth, supra,* at 61. The Court's expansive application of *Roe* in this period, even more than *Roe* itself, was fairly described as the "unrestrained imposition of [the Court's] own, extraconstitutional value preferences" on the American people. *Thornburgh* v.

*American College of Obstetricians and Gynecologists,* 476 U. S. 747, 794 (1986) (White, J., dissenting).

It appeared that this era of Court-mandated abortion on demand had come to an end, first with our decision in *Webster* v. *Reproductive Health Services,* 492 U. S. 490 (1989), see *id.,* at 557 (Blackmun, J., concurring in part and dissenting in part) (lamenting that the plurality had "discard[ed]" *Roe*), and then finally (or so we were told) in our decision in *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992). Although in *Casey* the separate opinions of THE CHIEF JUSTICE and JUSTICE SCALIA urging the Court to overrule *Roe* did not command a majority, seven Members of that Court, including six Members sitting today, acknowledged that States have a legitimate role in regulating abortion and recognized the States' interest in respecting fetal life at all stages of development. See 505 U. S., at 877 (joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.); *id.,* at 944 (REHNQUIST, C. J., joined by White, SCALIA, and THOMAS, JJ., concurring in judgment in part and dissenting in part); *id.,* at 979 (SCALIA, J., joined by REHNQUIST, C. J., and White and THOMAS, JJ., concurring in judgment in part and dissenting in part). The plurality authored by JUSTICES O'CONNOR, KENNEDY, and SOUTER concluded that prior case law "went too far" in "undervalu[ing] the State's interest in potential life" and in "striking down . . . some abortion regulations which in no real sense deprived women of the ultimate decision." *Id.,* at 875.[1] *Roe* and subsequent cases, according to the plurality, had wrongly "treat[ed] all governmental attempts to influence a woman's decision on behalf of the potential life within her as unwarranted," a treatment that was "incompatible with the recognition that there is a substantial state interest in potential life throughout pregnancy." *Id.,* at 876. Accordingly, the plurality held that so

---

[1] Unless otherwise noted, all subsequent cites of *Planned Parenthood of Southeastern Pa.* v. *Casey,* 505 U. S. 833 (1992), are to the joint opinion of O'CONNOR, KENNEDY, and SOUTER, JJ.

long as state regulation of abortion furthers legitimate interests—that is, interests not designed to strike at the right itself—the regulation is invalid only if it imposes an undue burden on a woman's ability to obtain an abortion, meaning that it places a *substantial obstacle* in the woman's path. *Id.*, at 874, 877.

My views on the merits of the *Casey* plurality have been fully articulated by others. *Id.*, at 944 (REHNQUIST, C. J., concurring in judgment in part and dissenting in part); *id.*, at 979 (SCALIA, J., concurring in judgment in part and dissenting in part). I will not restate those views here, except to note that the *Casey* plurality opinion was constructed by its authors out of whole cloth. The standard set forth in the *Casey* plurality has no historical or doctrinal pedigree. The standard is a product of its authors' own philosophical views about abortion, and it should go without saying that it has no origins in or relationship to the Constitution and is, consequently, as illegitimate as the standard it purported to replace. Even assuming, however, as I will for the remainder of this dissent, that *Casey*'s fabricated undue-burden standard merits adherence (which it does not), today's decision is extraordinary. Today, the Court inexplicably holds that the States cannot constitutionally prohibit a method of abortion that millions find hard to distinguish from infanticide and that the Court hesitates even to describe. *Ante*, at 923. This holding cannot be reconciled with *Casey*'s undue-burden standard, as that standard was explained to us by the authors of the plurality opinion, and the majority hardly pretends otherwise. In striking down this statute—which expresses a profound and legitimate respect for fetal life and which leaves unimpeded several other safe forms of abortion—the majority opinion gives the lie to the promise of *Casey* that regulations that do no more than "express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose" whether or not to have an abortion. 505

U. S., at 877. Today's decision is so obviously irreconcilable with *Casey*'s explication of what its undue-burden standard requires, let alone the Constitution, that it should be seen for what it is, a reinstitution of the pre-*Webster* abortion-on-demand era in which the mere invocation of "abortion rights" trumps any contrary societal interest. If this statute is unconstitutional under *Casey*, then *Casey* meant nothing at all, and the Court should candidly admit it.

To reach its decision, the majority must take a series of indefensible steps. The majority must first disregard the principles that this Court follows in every context but abortion: We interpret statutes according to their plain meaning, and we do not strike down statutes susceptible of a narrowing construction. The majority also must disregard the very constitutional standard it purports to employ, and then displace the considered judgment of the people of Nebraska and 29 other States. The majority's decision is lamentable, because of the result the majority reaches, the illogical steps the majority takes to reach it, and because it portends a return to an era I had thought we had at last abandoned.

## I

In the almost 30 years since *Roe*, this Court has never described the various methods of aborting a second- or third-trimester fetus. From reading the majority's sanitized description, one would think that this case involves state regulation of a widely accepted routine medical procedure. Nothing could be further from the truth. The most widely used method of abortion during this stage of pregnancy is so gruesome that its use can be traumatic even for the physicians and medical staff who perform it. See App, 656 (testimony of Dr. Boehm); W. Hern, Abortion Practice 134 (1990). And the particular procedure at issue in this case, "partial birth abortion," so closely borders on infanticide that 30 States have attempted to ban it. I will begin with a discussion of the methods of abortion available to

women late in their pregnancies before addressing the statutory and constitutional questions involved.[2]

1. The primary form of abortion used at or after 16 weeks' gestation is known as "dilation and evacuation" or "D&E." 11 F. Supp. 2d 1099, 1103, 1129 (Neb. 1998). When performed during that stage of pregnancy, the D&E procedure requires the physician to dilate the woman's cervix and then extract the fetus from her uterus with forceps. *Id.*, at 1103; App. 490 (American Medical Association (AMA), Report of the Board of Trustees on Late-Term Abortion). Because of the fetus' size at this stage, the physician generally removes the fetus by dismembering the fetus one piece at a time.[3] 11 F. Supp. 2d, at 1103–1104. The doctor grabs a fetal extremity, such as an arm or a leg, with forceps and "pulls it through the cervical os . . . tearing . . . fetal parts from the fetal body . . . by means of traction." *Id.*, at 1104. See App. 55 (testimony of Dr. Carhart). In other words, the physician will grasp the fetal parts and "basically tear off pieces of the fetus and pull them out." *Id.*, at 267 (testimony of Dr. Stubblefield). See also *id.*, at 149 (testimony of

---

[2] In 1996, the most recent year for which abortion statistics are available from the Centers for Disease Control and Prevention, there were approximately 1,221,585 abortions performed in the United States. Centers for Disease Control and Prevention, Abortion Surveillance—United States, 1996, p. 1 (July 30, 1999). Of these abortions, about 67,000—5.5%—were performed in or after the 16th week of gestation, that is, from the middle of the second trimester through the third trimester. *Id.*, at 5. The majority apparently accepts that none of the abortion procedures used for pregnancies in earlier stages of gestation, including "dilation and evacuation" (D&E) as it is practiced between 13 and 15 weeks' gestation, would be compromised by the statute. See *ante*, at 938–940 (concluding that the statute could be interpreted to apply to instrumental dismemberment procedures used in a later term D&E). Therefore, only the methods of abortion available to women in this later stage of pregnancy are at issue in this case.

[3] At 16 weeks' gestation, the average fetus is approximately six inches long. By 20 weeks' gestation, the fetus is approximately eight inches long. K. Moore & T. Persaud, The Developing Human 112 (6th ed. 1998).

Dr. Hodgson) ("[Y]ou grasp the fetal parts, and you often don't know what they are, and you try to pull it down, and its . . . simply all there is to it"). The fetus will die from blood loss, either because the physician has separated the umbilical cord prior to beginning the procedure or because the fetus loses blood as its limbs are removed. *Id.*, at 62–64 (testimony of Dr. Carhart); *id.*, at 151 (testimony of Dr. Hodgson).[4] When all of the fetus' limbs have been removed and only the head is left in utero, the physician will then collapse the skull and pull it through the cervical canal. *Id.*, at 106 (testimony of Dr. Carhart); *id.*, at 297 (testimony of Dr. Stubblefield); *Causeway Medical Suite* v. *Foster*, 43 F. Supp. 2d 604, 608 (ED La. 1999). At the end of the procedure, the physician is left, in respondent's words, with a "tray full of pieces." App. 125 (testimony of Dr. Carhart).

2. Some abortions after the 15th week are performed using a method of abortion known as induction. 11 F. Supp. 2d, at 1108; App. 492 (AMA, Report of the Board of Trustees on Late-Term Abortion). In an induction procedure, the amniotic sac is injected with an abortifacient such as a saline solution or a solution that contains prostaglandin. 11 F. Supp. 2d, at 1108. Uterine contractions typically follow, causing the fetus to be expelled. *Ibid.*

3. A third form of abortion for use during or after 16 weeks' gestation is referred to by some medical professionals as "intact D&E." There are two variations of this method, both of which require the physician to dilate the woman's cervix. Gynecologic, Obstetric, and Related Surgery 1043 (D. Nichols & D. Clarke-Pearson eds., 2d ed. 2000); App. 271 (testimony of Dr. Stubblefield). The first variation is used only in vertex presentations, that is, when the fetal head is presented first. To perform a vertex-presentation intact D&E, the doctor will insert an instrument into the fetus'

---

[4] Past the 20th week of gestation, respondent attempts to induce fetal death by injection prior to beginning the procedure in patients. 11 F. Supp. 2d, at 1106; App. 64.

skull while the fetus is still in utero and remove the brain and other intracranial contents. 11 F. Supp. 2d, at 1111; Gynecologic, Obstetric, and Related Surgery, *supra*, at 1043; App. 271 (testimony of Dr. Stubblefield). When the fetal skull collapses, the physician will remove the fetus.

The second variation of intact D&E is the procedure commonly known as "partial birth abortion."[5] 11 F. Supp. 2d, at 1106; Gynecologic, Obstetric, and Related Surgery, *supra*, at 1043; App. 271 (testimony of Dr. Stubblefield). This procedure, which is used only rarely, is performed on mid- to late-second-trimester (and sometimes third-trimester) fetuses.[6] Although there are variations, it is generally per-

---

[5] There is a disagreement among the parties regarding the appropriate term for this procedure. Congress and numerous state legislatures, including Nebraska's, have described this procedure as "partial birth abortion," reflecting the fact that the fetus is all but born when the physician causes its death. See *infra* this page and 987. Respondent prefers to refer generically to "intact dilation and evacuation" or "intact D&E" without reference to whether the fetus is presented head first or feet first. One of the doctors who developed the procedure, Martin Haskell, described it as "Dilation and Extraction" or "D&X." See The Partial-Birth Abortion Ban Act of 1995, Hearing on H. R. 1833 before the Senate Committee on the Judiciary, 104th Cong., 1st Sess., 5 (1995) (hereinafter H. R. 1833 Hearing). The Executive Board of the American College of Obstetricians and Gynecologists (ACOG) refers to the procedure by the hybrid term "intact dilation and extraction" or "intact D&X," see App. 599 (ACOG Executive Board, Statement on Intact Dilation and Extraction (Jan. 12, 1997)), which term was adopted by the AMA, see *id.*, at 492 (AMA, Report of the Board of Trustees on Late-Term Abortion). I will use the term "partial birth abortion" to describe the procedure because it is the legal term preferred by 28 state legislatures, including the State of Nebraska, and by the United States Congress. As I will discuss, see *infra*, at 999–1001, there is no justification for the majority's preference for the terms "breech-conversion intact D&E" and "D&X" other than the desire to make this procedure appear to be medically sanctioned.

[6] There is apparently no general understanding of which women are appropriate candidates for the procedure. Respondent uses the procedure on women at 16 to 20 weeks' gestation. 11 F. Supp. 2d, at 1105. The doctor who developed the procedure, Dr. Martin Haskell, indicated that he

formed as follows: After dilating the cervix, the physician will grab the fetus by its feet and pull the fetal body out of the uterus into the vaginal cavity. 11 F. Supp. 2d, at 1106. At this stage of development, the head is the largest part of the body. Assuming the physician has performed the dilation procedure correctly, the head will be held inside the uterus by the woman's cervix. *Ibid.;* H. R. 1833 Hearing 8. While the fetus is stuck in this position, dangling partly out of the woman's body, and just a few inches from a completed birth, the physician uses an instrument such as a pair of scissors to tear or perforate the skull. 11 F. Supp. 2d, at 1106; App. 664 (testimony of Dr. Boehm); Joint Hearing on S. 6 and H. R. 929 before the Senate Committee on the Judiciary and the Subcommittee on the Constitution of the House Committee on the Judiciary, 105th Cong., 1st Sess., 45 (1995) (hereinafter S. 6 and H. R. 929 Joint Hearing). The physician will then either crush the skull or will use a vacuum to remove the brain and other intracranial contents from the fetal skull, collapse the fetus' head, and pull the fetus from the uterus. 11 F. Supp. 2d, at 1106.[7]

Use of the partial birth abortion procedure achieved prominence as a national issue after it was publicly described by Dr. Martin Haskell, in a paper entitled "Dilation and Extraction for Late Second Trimester Abortion," at the National Abortion Federation's September 1992 Risk Management Seminar. In that paper, Dr. Haskell described his version of the procedure as follows:

"With a lower [fetal] extremity in the vagina, the surgeon uses his fingers to deliver the opposite lower

performed the procedure on patients 20 through 24 weeks and on certain patients 25 through 26 weeks. See H. R. 1833 Hearing 36.

[7] There are, in addition, two forms of abortion that are used only rarely: hysterotomy, a procedure resembling a Caesarean section, requires the surgical delivery of the fetus through an incision on the uterine wall, and hysterectomy. 11 F. Supp. 2d, at 1109.

extremity, then the torso, the shoulders and the upper extremities.

"The skull lodges at the internal cervical os. Usually there is not enough dilation for it to pass through. The fetus is oriented dorsum or spine up.

"At this point, the right-handed surgeon slides the fingers of the left hand along the back of the fetus and 'hooks' the shoulders of the fetus with the index and ring fingers (palm down).

"[T]he surgeon takes a pair of blunt curved Metzenbaum scissors in the right hand. He carefully advances the tip, curved down, along the spine and under his middle finger until he feels it contact the base of the skull under the tip of his middle finger.

"[T]he surgeon then forces the scissors into the base of the skull or into the foramen magnum. Having safely entered the skull, he spreads the scissors to enlarge the opening.

"The surgeon removes the scissors and introduces a suction catheter into this hole and evacuates the skull contents. With the catheter still in place, he applies traction to the fetus, removing it completely from the patient." H. R. 1833 Hearing 3, 8–9.

In cases in which the physician inadvertently dilates the woman to too great a degree, the physician will have to hold the fetus inside the woman so that he can perform the procedure. *Id.*, at 80 (statement of Pamela Smith, M. D.) ("In these procedures, one basically relies on cervical entrapment of the head, along with a firm grip, to help keep the baby in place while the practitioner plunges a pair of scissors into the base of the baby's skull"). See also S. 6 and H. R. 929 Joint Hearing 45 ("I could put dilapan in for four or five days and say I'm doing a D&E procedure and the fetus could just fall out. But that's not really the point. The point here is you're attempting to do an abortion . . . . Not to see how do

I manipulate the situation so that I get a live birth instead")
(quoting Dr. Haskell).

II

Nebraska, along with 29 other States, has attempted to
ban the partial birth abortion procedure. Although the Ne-
braska statute purports to prohibit only "partial birth abor-
tion," a phrase which is commonly used, as I mentioned, to
refer to the breech extraction version of intact D&E, the
majority concludes that this statute could also be read in
some future case to prohibit ordinary D&E, the first proce-
dure described above. According to the majority, such an
application would pose a substantial obstacle to some women
seeking abortions and, therefore, the statute is unconstitu-
tional. The majority errs with its very first step. I think
it is clear that the Nebraska statute does not prohibit the
D&E procedure. The Nebraska partial birth abortion stat-
ute at issue in this case reads as follows:

> "No partial-birth abortion shall be performed in this
> state, unless such procedure is necessary to save the life
> of the mother whose life is endangered by a physical
> disorder, physical illness, or physical injury, including
> a life-endangering physical condition caused by or aris-
> ing from the pregnancy itself." Neb. Rev. Stat. Ann.
> § 28–328(1) (Supp. 1999).

"Partial birth abortion" is defined in the statute as

> "an abortion procedure in which the person performing
> the abortion partially delivers vaginally a living unborn
> child before killing the unborn child and completing the
> delivery. For purposes of this subdivision, the term
> partially delivers vaginally a living unborn child before
> killing the unborn child means deliberately and inten-
> tionally delivering into the vagina a living unborn child,
> or a substantial portion thereof, for the purpose of per-
> forming a procedure that the person performing such

procedure knows will kill the unborn child and does kill the unborn child." § 28–326(9).

## A

Starting with the statutory definition of "partial birth abortion," I think it highly doubtful that the statute could be applied to ordinary D&E. First, the Nebraska statute applies only if the physician "partially *delivers* vaginally a living unborn child," which phrase is defined to mean "deliberately and intentionally *delivering* into the vagina a living unborn child, or a substantial portion thereof." § 28–326(9) (emphases added). When read in context, the term "partially delivers" cannot be fairly interpreted to include removing pieces of an unborn child from the uterus one at a time.

The word "deliver," particularly delivery of an "unborn child," refers to the process of "assist[ing] in giving birth," which suggests removing an intact unborn child from the womb, rather than pieces of a child. See Webster's Ninth New Collegiate Dictionary 336 (1991) (defining "deliver" as "to assist in giving birth; to aid in the birth of"); Stedman's Medical Dictionary 409 (26th ed. 1995) ("To assist a woman in childbirth"). Without question, one does not "deliver" a child when one removes the child from the uterus piece by piece, as in a D&E. Rather, in the words of respondent and his experts, one "remove[s]" or "dismember[s]" the child in a D&E. App. 45, 55 (testimony of Dr. Carhart) (referring to the act of removing the fetus in a D&E); *id.*, at 150 (testimony of Dr. Hodgson) (same); *id.*, at 267 (testimony of Dr. Stubblefield) (physician "dismember[s]" the fetus). See also H. R. 1833 Hearing 3, 8 (Dr. Haskell describing "delivery" of part of the fetus during a D&X). The majority cites sources using the terms "deliver" and "delivery" to refer to removal of the fetus and the placenta during birth. But these sources also presume an intact fetus, rather than dismembered fetal parts. See Obstetrics: Normal & Problem Pregnancies 388 (S. Gabbe, J. Niebyl, & J. Simpson eds., 3d

ed. 1996) ("After delivery [of infant and placenta], the placenta, cord, and membranes should be examined"); 4 Oxford English Dictionary 421, 422 (2d ed. 1989) ("To disburden (a woman) of the foetus, to bring to childbirth"); B. Maloy, Medical Dictionary for Lawyers 221 (2d ed. 1989) ("To aid in the process of childbirth; to bring forth; to deliver the fetus, placenta"). The majority has pointed to no source in which "delivery" is used to refer to removal of first a fetal arm, then a leg, then the torso, etc. In fact, even the majority describes the D&E procedure without using the word "deliver" to refer to the removal of fetal tissue from the uterus. See *ante*, at 939 ("*pulling* a 'substantial portion' of a still living fetus" (emphasis added)); *ibid.* ("portion of a living fetus has been *pulled* into the vagina" (emphasis added)). No one, including the majority, understands the act of pulling off a part of a fetus to be a "delivery."

To make the statute's meaning even more clear, the statute applies only if the physician "partially delivers vaginally a living unborn child *before* killing the unborn child and completing the delivery." The statute defines this phrase to mean that the physician must complete the delivery "*for the purpose of* performing a procedure" that will kill the unborn child. It is clear from these phrases that the procedure that kills the fetus must be subsequent to, and therefore separate from, the "partia[l] deliver[y]" or the "deliver[y] into the vagina" of "a living unborn child or substantial portion thereof." In other words, even if one assumes, *arguendo*, that dismemberment—the act of grasping a fetal arm or leg and pulling until it comes off, leaving the remaining part of the fetal body still in the uterus—is a kind of "delivery," it does not take place "before" the death-causing procedure or "for the purpose of performing" the death-causing procedure; it *is* the death-causing procedure. Under the majority's view, D&E is covered by the statute because when the doctor pulls on a fetal foot until it tears off he has "delivered" a substantial portion of the unborn child and has performed

a procedure known to cause death. But, significantly, the physician has not "delivered" the child *before* performing the death-causing procedure or "for the purpose of" performing the death-causing procedure; the dismemberment "delivery" is itself the act that causes the fetus' death.[8]

Moreover, even if removal of a fetal foot or arm from the uterus incidental to severing it from the rest of the fetal body could amount to delivery *before*, or *for the purpose of*, performing a death-causing procedure, the delivery would not be of an "unborn child, or a substantial portion thereof." And even supposing that a fetal foot or arm could conceivably be a "substantial portion" of an unborn child, both the common understanding of "partial birth abortion" and the principle that statutes will be interpreted to avoid constitutional difficulties would require one to read "substantial" otherwise. See *infra*, at 996–997.

### B

Although I think that the text of § 28–326(9) forecloses any application of the Nebraska statute to the D&E procedure, even if there were any ambiguity, the ambiguity would be conclusively resolved by reading the definition in light of the fact that the Nebraska statute, by its own terms, applies only to "partial birth abortion," § 28–328(1). By ordinary rules of statutory interpretation, we should resolve any ambiguity in the specific statutory definition to comport with the common understanding of "partial birth abortion," for that term itself, no less than the specific definition, is part of the stat-

---

[8] The majority argues that the statute does not explicitly require that the death-causing procedure be separate from the overall abortion procedure. That is beside the point; under the statute the death-causing procedure must be separate from the *delivery*. Moreover, it is incorrect to state that the statute contemplates only one "procedure." The statute clearly uses the term "procedure" to refer to both the overall abortion procedure ("partial birth abortion" is "an abortion procedure") as well as to a component of the overall abortion procedure ("for the purpose of performing a procedure . . . that will kill the unborn child").

ute. *United States* v. *Morton*, 467 U. S. 822, 828 (1984) ("We do not . . . construe statutory phrases in isolation; we read statutes as a whole").[9]

"Partial birth abortion" is a term that has been used by a majority of state legislatures, the United States Congress, medical journals, physicians, reporters, even judges, and has never, as far as I am aware, been used to refer to the D&E procedure. The number of instances in which "partial birth abortion" has been equated with the breech extraction form of intact D&E (otherwise known as "D&X")[10] and explicitly contrasted with D&E, are numerous. I will limit myself to just a few examples.

First, numerous medical authorities have equated "partial birth abortion" with D&X. The AMA has done so and has recognized that the procedure is "different from other destructive abortion techniques because the fetus . . . is killed *outside* of the womb." AMA Board of Trustees Factsheet on H. R. 1122 (June 1997), in App. to Brief for Association of American Physicians and Surgeons et al. as *Amici Curiae* 1. Medical literature has also equated "partial birth abortion" with D&X as distinguished from D&E. See Gynecologic, Obstetric, and Related Surgery, at 1043; Sprang & Neerhof, Rationale for Banning Abortions Late in Pregnancy, 280 JAMA 744 (Aug. 26, 1998); Bopp & Cook, Partial Birth Abortion: The Final Frontier of Abortion Jurisprudence, 14 Issues in Law and Medicine 3 (1998). Physicians have equated "partial birth abortion" with D&X. See *Planned Parenthood* v. *Doyle*, 44 F. Supp. 2d 975, 999 (WD Wis. 1999) (citing testimony); *Richmond Medical Center for Women* v. *Gil-*

―――――――――

[9] It is certainly true that an undefined term must be construed in accordance with its ordinary and plain meaning. *FDIC* v. *Meyer*, 510 U. S. 471, 476 (1994). But this does not mean that the ordinary and plain meaning of a term is wholly irrelevant when that term is defined.

[10] As noted, see n. 5, *supra*, there is no consensus regarding which of these terms is appropriate to describe the procedure. I assume, as the majority does, that the terms are, for purposes here, interchangeable.

*more,* 55 F. Supp. 2d 441, 455 (ED Va. 1999) (citing testimony). Even respondent's expert, Dr. Phillip Stubblefield, acknowledged that breech extraction intact D&E is referred to in the lay press as "partial birth abortion." App. 271.

Second, the lower courts have repeatedly acknowledged that "partial birth abortion" is commonly understood to mean D&X. See *Little Rock Family Planning Services* v. *Jegley,* 192 F. 3d 794, 795 (CA8 1999) ("The term 'partial-birth abortion,' . . . is commonly understood to refer to a particular procedure also known as intact dilation and extraction"); *Planned Parenthood of Greater Iowa, Inc.* v. *Miller,* 195 F. 3d 386, 387 (CA8 1999) ("The [Iowa] Act prohibits 'partial-birth abortion,' a term commonly understood to refer to a procedure called a dilation and extraction (D&X)"). The District Court in this case noted that "[p]artial-birth abortions" are "known medically as intact dilation and extraction or D&X." 11 F. Supp. 2d, at 1121, n. 26. Even the majority notes that "partial birth abortion" is a term "ordinarily associated with the D&X procedure." *Ante,* at 942.

Third, the term "partial birth abortion" has been used in state legislation on 28 occasions and by Congress twice. The term "partial birth abortion" was adopted by Congress in both 1995 and 1997 in two separate pieces of legislation prohibiting the procedure.[11] In considering the legislation,

---

[11] Congressional legislation prohibiting the procedure was first introduced in June 1995, with the introduction of the Partial Birth Abortion Ban Act, H. R. 1833. This measure, which was sponsored by 165 individual House Members, passed both Houses by wide margins, 141 Cong. Rec. 35892 (1995); 142 Cong. Rec. 31169 (1996), but was vetoed by President Clinton, see *id.,* at 7467. The House voted to override the veto on September 19, 1996, see *id.,* at 23851; however, the Senate failed to override by a margin of 13 votes, see *id.,* at 25829. In the next Congress, 181 individual House cosponsors reintroduced the Partial Birth Abortion Ban Act as H. R. 929, which was later replaced in the House with H. R. 1122. See H. R. 1122, 105th Cong., 1st Sess. (1997). The House and Senate again adopted the legislation, as amended, by wide margins. See 143

Congress conducted numerous hearings and debates on the issue, which repeatedly described "partial birth abortion" as a procedure distinct from D&E. The Congressional Record contained numerous references to Dr. Haskell's procedure. See, e. g., H. R. 1833 Hearing 3, 17, 52, 77; S. 6 and H. R. 929 Joint Hearing 45. Since that time, debates have taken place in state legislatures across the country, 30 of which have voted to prohibit the procedure. With only two exceptions, the legislatures that voted to ban the procedure referred to it as "partial birth abortion." [12] These debates also referred to Dr. Haskell's procedure as D&X. Both the evidence before the legislators and the legislators themselves equated "partial birth abortion" with D&X. The fact that 28 States adopted legislation banning "partial birth abortion," defined it in a way similar or identical to Nebraska's definition, [13] and,

Cong. Rec. H1230 (Mar. 20, 1997); id., at S4715 (May 20, 1997). President Clinton again vetoed the bill. See id., at H8891 (Oct. 10, 1997). Again, the veto override passed in the House and fell short in the Senate. See 144 Cong. Rec. H6213 (July 23, 1998); id., at S10564 (Sept. 18, 1998).

[12] Consistent with the practice of Dr. Haskell (an Ohio practitioner), Ohio referred to the procedure as "dilation and extraction," defined as "the termination of a human pregnancy by purposely inserting a suction device into the skull of a fetus to remove the brain." Ohio Rev. Code Ann. § 2919.15(A) (1997). Missouri refers to the killing of a "partially-born" infant as "infanticide." Mo. Stat. Ann. § 565.300 (Vernon Supp. 2000).

[13] For the most part, these States defined the term "partial birth abortion" using language similar to that in the 1995 proposed congressional legislation, that is "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery." See H. R. 1833 Hearing 210. See, e. g., Alaska Stat. Ann. § 18.16.050 (1998); Ariz. Rev. Stat. Ann. § 13–3603.01 (Supp. 1999); Ark. Code Ann. § 5–61–202 (1997); Fla. Stat. § 390.011 (Supp. 2000); Ill. Comp. Stat., ch. 720, § 513/5 (1999); Ind. Code Ann. § 16–18–2–267.5 (West Supp. 1999); Mich. Comp. Laws Ann. § 333.17016(5)(c) (West Supp. 2000); Miss. Code Ann. § 41–41–73(2)(a) (Supp. 1998); S. C. Code Ann. § 44–41–85(A)(1) (1999 Cum. Supp.). Other States, including Nebraska, see Neb. Rev. Stat. Ann. § 28–326 (Supp. 1999), defined "partial-birth abortion" using language similar to that used in the 1997 proposed congressional

in doing so, repeatedly referred to the breech extraction form of intact D&E and repeatedly distinguished it from ordinary D&E, makes it inconceivable that the term "partial birth abortion" could reasonably be interpreted to mean D&E.

## C

Were there any doubt remaining whether the statute could apply to a D&E procedure, that doubt is no ground for invalidating the statute. Rather, we are bound to first consider whether a construction of the statute is fairly possible that would avoid the constitutional question. *Erznoznik* v. *Jacksonville*, 422 U. S. 205, 216 (1975) ("[A] state statute should not be deemed facially invalid unless it is not readily subject to a narrowing construction by the state courts"); *Frisby* v. *Schultz*, 487 U. S. 474, 482 (1988) ("The precise scope of the ban is not further described within the text of the ordinance, but in our view the ordinance is readily subject to a narrowing construction that avoids constitutional difficulties"). This principle is, as JUSTICE O'CONNOR has said, so "well-established" that failure to apply is "plain error." *Id.*, at 483. Although our interpretation of a Nebraska law is of course not binding on Nebraska courts, it is clear, as *Erznoznik* and *Frisby* demonstrate, that, absent a conflicting interpretation by Nebraska (and there is none here), we should, if the text permits, adopt such a construction.

---

legislation, which retained the definition of partial birth abortion used in the 1995 bill, that is "an abortion in which the person performing the abortion partially vaginally delivers a living fetus before killing the fetus and completing the delivery," but further defined that phrase to mean "deliberately and intentionally delivers into the vagina a living fetus, or a substantial portion there of, for the purpose of performing a procedure the physician knows will kill the fetus, and kills the fetus." See Partial Birth Abortion Ban Act of 1997, H. R. 1122, 105th Cong., 1st Sess. (1997). See, *e. g.*, Idaho Code § 18–613(a) (Supp. 1999); Iowa Code Ann. § 707.8A(1)(c) (Supp. 1999); N. J. Stat. Ann. § 2A:65A–6(e) (West Supp. 2000); Okla. Stat. Ann., Tit. 21, § 684 (Supp. 2000); R. I. Gen. Laws § 23–4.12–1 (Supp. 1999); Tenn. Code Ann. § 39–15–209(a)(1) (1997).

The majority contends that application of the Nebraska statute to D&E would pose constitutional difficulties because it would eliminate the most common form of second-trimester abortions. To the extent that the majority's contention is true, there is no doubt that the Nebraska statute is susceptible of a narrowing construction by Nebraska courts that would preserve a physicians' ability to perform D&E. See *State* v. *Carpenter*, 250 Neb. 427, 434, 551 N. W. 2d 518, 524 (1996) ("A penal statute must be construed so as to meet constitutional requirements if such can reasonably be done"). For example, the statute requires that the physician "deliberately and intentionally delive[r] into the vagina a living unborn child, or a substantial portion thereof," before performing a death-causing procedure. The term "substantial portion" is susceptible to a narrowing construction that would exclude the D&E procedure. One definition of the word "substantial" is "being largely but not wholly that which is specified." Webster's Ninth New Collegiate Dictionary, at 1176. See *Pierce* v. *Underwood*, 487 U. S. 552, 564 (1988) (describing different meanings of the term "substantial"). In other words, "substantial" can mean "almost all" of the thing denominated. If nothing else, a court could construe the statute to require that the fetus be "largely, but not wholly," delivered out of the uterus before the physician performs a procedure that he knows will kill the unborn child. Or, as I have discussed, a court could (and should) construe "for the purpose of performing a procedure" to mean "for the purpose of performing a separate procedure."

## III

The majority and JUSTICE O'CONNOR reject the plain language of the statutory definition, refuse to read that definition in light of the statutory reference to "partial birth abortion," and ignore the doctrine of constitutional avoidance. In so doing, they offer scant statutory analysis of their own. See *ante*, at 938–940 (majority opinion); cf. *ante*, at 940–945

(majority opinion); *ante,* at 948–949 (O'CONNOR, J., concurring). In their brief analyses, the majority and JUSTICE O'CONNOR disregard all of the statutory language except for the final definitional sentence, thereby violating the fundamental canon of construction that statutes are to be read as a whole. *United States* v. *Morton,* 467 U. S., at 828 ("We do not . . . construe statutory phrases in isolation; we read statutes as a whole. Thus, the words [in question] must be read in light of the immediately following phrase") (footnote omitted)); *United States* v. *Heirs of Boisdoré,* 8 How. 113, 122 (1849) ("In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy"); *Gustafson* v. *Alloyd Co.,* 513 U. S. 561, 575 (1995) ("[A] word is known by the company it keeps").[14] In lieu of analyzing the statute as a whole, the majority and JUSTICE O'CONNOR

---

[14] The majority argues that its approach is supported by *Meese* v. *Keene,* 481 U. S. 465, 487 (1987), in which the Court stated that "the statutory definition of [a] term excludes unstated meanings of that term." But this case provides no support for the approach adopted by the majority and JUSTICE O'CONNOR. In *Meese,* the Court addressed a statute that used the term "political propaganda." *Id.,* at 470. The Court noted that there were two commonly understood meanings to the term "political propaganda," *id.,* at 477, and, not surprisingly, chose the definition that was most consistent with the statutory definition, *id.,* at 485. Nowhere did the Court suggest that, because "political propaganda" was defined in the statute, the commonly understood meanings of that term were irrelevant. Indeed, a significant portion of the Court's opinion was devoted to describing the effect of Congress' use of that term. *Id.,* at 477–479, 483–484. So too, *Colautti* v. *Franklin,* 439 U. S. 379, 392–393, n. 10 (1979), and *Western Union Telegraph Co.* v. *Lenroot,* 323 U. S. 490 (1945), support the proposition that when there are two possible interpretations of a term, and only one comports with the statutory definition, the term should not be read to include the unstated meaning. But here, there is only one possible interpretation of "partial birth abortion"—the majority can cite no authority using that term to describe D&E—and so there is no justification for the majority's willingness to entirely disregard the statute's use of that term.

offer five principal arguments for their interpretation of the statute. I will address them in turn.

First, the majority appears to accept, if only obliquely, an argument made by respondent: If the term "partial birth abortion" refers to only the breech extraction form of intact D&E, or D&X, the Nebraska Legislature should have used the medical nomenclature. See *ante,* at 943 (noting that the Nebraska Legislature rejected an amendment that would replace "partial birth abortion" with "dilation and extraction"); Brief for Respondent 4–5, 24.

There is, of course, no requirement that a legislature use terminology accepted by the medical community. A legislature could, no doubt, draft a statute using the term "heart attack" even if the medical community preferred "myocardial infarction." Legislatures, in fact, sometimes use medical terms in ways that conflict with their clinical definitions, see, *e. g., Barber* v. *Director,* 43 F. 3d 899, 901 (CA4 1995) (noting that the medical definition of "pneumoconiosis" is only a subset of the afflictions that fall within the definition of "pneumoconiosis" in the Black Lung Act), a practice that is unremarkable so long as the legal term is adequately defined. We have never, until today, suggested that legislature may only use words accepted by every individual physician. Rather, "we have traditionally left to legislators the task of defining terms of a medical nature that have legal significance." *Kansas* v. *Hendricks,* 521 U. S. 346, 359 (1997). And we have noted that "[o]ften, those definitions do not fit precisely with the definitions employed by the medical community." *Ibid.*

Further, it is simply not true that the many legislatures, including Nebraska's, that prohibited "partial birth abortion" chose to use a term known only in the vernacular in place of a term with an accepted clinical meaning. When the Partial-Birth Abortion Ban Act of 1995 was introduced in Congress, the term "dilation and extraction" did not appear in any medical dictionary. See, *e. g.,* Dorland's Illustrated

Medical Dictionary 470 (28th ed. 1994); Stedman's Medical Dictionary, at 485; Miller-Keane Encyclopedia & Dictionary of Medicine, Nursing, & Allied Health 460 (6th ed. 1997); The Sloane-Dorland Annotated Medical-Legal Dictionary 204 (1987); I. Dox, J. Melloni, & G. Eisher, The HarperCollins Illustrated Medical Dictionary 131 (1993). The term did not appear in descriptions of abortion methods in leading medical textbooks. See, *e. g.*, G. Cunningham et al., Williams Obstetrics 579–605 (20th ed. 1997); Obstetrics: Normal & Problem Pregnancies, at 1249–1279; W. Hern, Abortion Practice (1990). Abortion reference books also omitted any reference to the term. See, *e. g.*, Modern Methods of Inducing Abortion (D. Baird, D. Grimes, & P. Van Look eds. 1995); E. Glick, Surgical Abortion (1998).[15]

Not only did D&X have no medical meaning at the time, but the term is ambiguous on its face. "Dilation and extraction" would, on its face, accurately describe any procedure in which the woman is "dilated" and the fetus "extracted," including D&E. See *supra*, at 984–985. In contrast, "partial birth abortion" has the advantage of faithfully describing the procedure the legislature meant to address because the fact that a fetus is "partially born" during the procedure is indisputable. The term "partial birth abortion" is completely accurate and descriptive, which is perhaps the reason why the majority finds it objectionable. Only a desire to find fault at any cost could explain the Court's willingness to penalize the Nebraska Legislature for failing to replace a

---

[15] Nor, for that matter, did the terms "intact dilation and extraction" or "intact dilation and evacuation" appear in textbooks or medical dictionaries. See *supra*, at 999 and this page. In fact, respondent's preferred term "intact D&E" would compound, rather than remedy, any confusion regarding the statute's meaning. As is evident from the majority opinion, there is no consensus on what this term means. Compare *ante*, at 927 (describing "intact D&E" to refer to both breech and vertex presentation procedures), with App. 6 (testimony of Dr. Henshaw) (using "intact D&E" to mean only breech procedure), with *id.*, at 275 (testimony of Dr. Stubblefield) (using "intact D&E" to refer to delivery of fetus that has died in utero).

descriptive term with a vague one. There is, therefore, nothing to the majority's argument that the Nebraska Legislature is at fault for declining to use the term "dilation and extraction." [16]

Second, the majority faults the Nebraska Legislature for failing to "track the medical differences between D&E and D&X" and for failing to "suggest that its application turns on whether a portion of the fetus' body is drawn into the vagina as part of a process to extract an intact fetus after collapsing the head as opposed to a process that would dismember the fetus." *Ante*, at 939. I have already explained why the Nebraska statute reflects the medical differences between D&X and D&E. To the extent the majority means that the Nebraska Legislature should have "tracked the medical differences" by adopting one of the informal definitions of D&X, this argument is without merit; none of these definitions would have been effective to accomplish the State's purpose of preventing abortions of partially born fetuses. Take, for example, ACOG's informal definition of the term "intact D&X." According to ACOG, an "intact D&X" consists of the following four steps: (1) deliberate dilation of

---

[16] The fact that the statutory term "partial birth abortion" may express a political or moral judgment, whereas "dilation and extraction" does not, is irrelevant. It is certainly true that technical terms are frequently empty of normative content. (Of course, the decision to use a technical term can itself be normative. See *ante, passim* (majority opinion)). But, so long as statutory terms are adequately defined, there is no requirement that Congress or state legislatures draft statutes using morally agnostic terminology. See, *e. g.*, 18 U. S. C. § 922(v) (making it unlawful to "manufacture, transfer, or possess a semiautomatic assault weapon"); Kobayashi & Olson et al., *In re 101 California Street*: A Legal and Economic Analysis of Strict Liability for the Manufacture and Sale of "Assault Weapons," 8 Stan. L. & Pol'y Rev. 41, 43 (1997) ("Prior to 1989, the term 'assault weapon' did not exist in the lexicon of firearms. It is a political term, developed by anti-gun publicists to expand the category of 'assault rifles' so as to allow an attack on as many additional firearms as possible on the basis of undefined 'evil' appearance"). See also *Meese*, 481 U. S., at 484–485.

the cervix, usually over a sequence of days; (2) instrumental conversion of the fetus to a footling breach; (3) breech extraction of the body excepting the head; and (4) partial evacuation of the intracranial contents of a living fetus to effect vaginal delivery of a dead but otherwise intact fetus. App. 599–600 (ACOG Executive Board, Statement on Intact Dilation and Extraction (Jan. 12, 1997)). ACOG emphasizes that "unless all four elements are present in sequence, the procedure is not an intact D&X." *Id.*, at 600. Had Nebraska adopted a statute prohibiting "intact D&X," and defined it along the lines of the ACOG definition, physicians attempting to perform abortions on partially born fetuses could have easily evaded the statute. Any doctor wishing to perform a partial birth abortion procedure could simply avoid liability under such a statute by performing the procedure, as respondent does, only when the fetus is presented feet first, thereby avoiding the necessity of "conversion of the fetus to a footling breech." *Id.*, at 599. Or, a doctor could convert the fetus without instruments. Or, the doctor could cause the fetus' death before "partial evacuation of the intracranial contents," *id.*, at 600, by plunging scissors into the fetus' heart, for example. A doctor could even attempt to evade the statute by chopping off two fetal toes prior to completing delivery, preventing the State from arguing that the fetus was "otherwise intact." Presumably, however, Nebraska, and the many other legislative bodies that adopted partial birth abortion bans, were not concerned with whether death was inflicted by injury to the brain or the heart, whether the fetus was converted with or without instruments, or whether the fetus died with its toes attached. These legislative bodies were, I presume, concerned with whether the child was partially born before the physician caused its death. The legislatures' evident concern was with permitting a procedure that resembles infanticide and threatens to dehumanize the fetus. They, therefore, presumably declined to adopt a

ban only on "intact D&X," as defined by ACOG, because it would have been ineffective to that purpose. Again, the majority is faulting Nebraska for a legitimate legislative calculation.

Third, the majority and JUSTICE O'CONNOR argue that this Court generally defers to lower federal courts' interpretations of state law. *Ante*, at 940 (majority opinion); *ante*, at 949 (O'CONNOR, J., concurring). However, a decision drafted by JUSTICE O'CONNOR, which she inexplicably fails to discuss, *Frisby* v. *Schultz*, 487 U. S. 474 (1988), makes clear why deference is inappropriate here. As JUSTICE O'CONNOR explained in that case:

> "[W]hile we ordinarily defer to lower court constructions of state statutes, we do not invariably do so. We are particularly reluctant to defer when the lower courts have fallen into plain error, which is precisely the situation presented here. To the extent they endorsed a broad reading of the ordinance, the lower courts ran afoul of the well-established principle that statutes will be interpreted to avoid constitutional difficulties." *Id.*, at 483 (citations omitted).

*Frisby*, then, identifies exactly why the lower courts' opinions here are not entitled to deference: The lower courts failed to identify the narrower construction that, consistent with the text, would avoid any constitutional difficulties.

Fourth, the majority speculates that some Nebraska prosecutor may attempt to stretch the statute to apply it to D&E. But a state statute is not unconstitutional on its face merely because we can imagine an aggressive prosecutor who would attempt an overly aggressive application of the statute. We have noted that "'[w]ords inevitably contain germs of uncertainty.'" *Broadrick* v. *Oklahoma*, 413 U. S. 601, 608 (1973). We do not give statutes the broadest definition imaginable. Rather, we ask whether "the ordinary

person exercising ordinary common sense can sufficiently understand and comply with [the statute]." *Ibid. (*quoting *Civil Service Comm'n* v. *Letter Carriers,* 413 U. S. 548, 579 (1973)). While a creative legal mind might be able to stretch the plain language of the Nebraska statute to apply to D&E, "citizens who desire to obey the statute will have no difficulty in understanding it." *Colten* v. *Kentucky,* 407 U. S. 104, 110 (1972) (internal quotation marks omitted).

Finally, the majority discusses at some length the reasons it will not defer to the interpretation of the statute proffered by the Nebraska Attorney General, despite the Attorney General's repeated representations to this Court that his State will not apply the partial birth abortion statute to D&E. See Brief for Petitioners 11–13; Tr. of Oral Arg. 10–11. The fact that the Court declines to defer to the interpretation of the Attorney General is not, however, a reason to give the statute a contrary representation. Even without according the Attorney General's view any particular respect, we should agree with his interpretation because it is undoubtedly the correct one. Moreover, JUSTICE O'CONNOR has noted that the Court should adopt a narrow interpretation of a state statute when it is supported by the principle that statutes will be interpreted to avoid constitutional difficulties as well as by "the representations of counsel . . . at oral argument." *Frisby* v. *Schultz, supra,* at 483. Such an approach is particularly appropriate in this case because, as the majority notes, Nebraska courts accord the Nebraska Attorney General's interpretations of state statutes "substantial weight." See *State* v. *Coffman,* 213 Neb. 560, 561, 330 N. W. 2d 727, 728 (1983). Therefore, any renegade prosecutor bringing criminal charges against a physician for performing a D&E would find himself confronted with a contrary interpretation of the statute by the Nebraska Attorney General, and, I assume, a judge who both possessed common

sense and was aware of the rule of lenity. See *State* v. *White*, 254 Neb. 566, 575, 577 N. W. 2d 741, 747 (1998).[17]

## IV

Having resolved that Nebraska's partial birth abortion statute permits doctors to perform D&E abortions, the question remains whether a State can constitutionally prohibit the partial birth abortion procedure without a health exception. Although the majority and JUSTICE O'CONNOR purport to rely on the standard articulated in the *Casey* plurality in concluding that a State may not, they in fact disregard it entirely.

### A

Though JUSTICES O'CONNOR, KENNEDY, and SOUTER declined in *Casey*, on the ground of *stare decisis*, to reconsider whether abortion enjoys any constitutional protection, 505 U. S., at 844–846, 854–869 (majority opinion); *id.*, at 871 (plurality opinion), *Casey* professed to be, in part, a repudiation of *Roe* and its progeny. The *Casey* plurality expressly noted that prior case law had undervalued the State's interest in potential life, 505 U. S., at 875–876, and had invalidated regulations of abortion that "in no real sense deprived women of the ultimate decision," *id.*, at 875. See *id.*, at 871 ("*Roe* v. *Wade* speaks with clarity in establishing . . . the State's 'important and legitimate interest in potential life.' That por-

---

[17] The majority relies on JUSTICE SCALIA's observation in *Crandon* v. *United States*, 494 U. S. 152 (1990), that "we have never thought that the interpretation of those charged with prosecuting criminal statutes is entitled to deference." *Id.*, at 177. But JUSTICE SCALIA was commenting on the United States Attorney General's overly broad interpretation of a federal statute, deference to which, as he said, would "turn the normal construction of criminal statutes upside-down, replacing the doctrine of lenity with a doctrine of severity." *Id.*, at 178. Here, the Nebraska Attorney General has adopted a *narrow* view of a criminal statute, one that comports with the rule of lenity (not to mention the statute's plain meaning).

tion of the decision in *Roe* has been given too little acknowledgment" (citation omitted)). The plurality repeatedly recognized the States' weighty interest in this area. See *id.*, at 877 ("State . . . may express profound respect for the life of the unborn"); *id.*, at 878 ("the State's profound interest in potential life"); *id.*, at 850 (majority opinion) ("profound moral and spiritual implications of terminating a pregnancy, even in its earliest stage"). And, the plurality expressed repeatedly the States' legitimate role in regulating abortion procedures. See *id.*, at 876 ("The very notion that the State has a substantial interest in potential life leads to the conclusion that not all regulations must be deemed unwarranted"); *id.*, at 875 ("Not all governmental intrusion [with abortion] is of necessity unwarranted"). According to the plurality: "The fact that a law which serves a valid purpose, one not designed to strike at the right itself, has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it." *Id.*, at 874.

The *Casey* plurality therefore adopted the standard: "Only where state regulation imposes an undue burden on a woman's ability to make this decision does the power of the State reach into the heart of the liberty protected by the Due Process Clause." *Ibid.* A regulation imposes an "undue burden" only if it "has the effect of placing a substantial obstacle in the path of a woman's choice." *Id.*, at 877.

### B

There is no question that the State of Nebraska has a valid interest—one not designed to strike at the right itself—in prohibiting partial birth abortion. *Casey* itself noted that States may "express profound respect for the life of the unborn." *Ibid.* States may, without a doubt, express this profound respect by prohibiting a procedure that approaches infanticide, and thereby dehumanizes the fetus and trivializes human life. The AMA has recognized that this procedure is "ethically different from other destructive abortion

techniques because the fetus, normally twenty weeks or longer in gestation, is killed *outside* the womb. The 'partial birth' gives the fetus an autonomy which separates it from the right of the woman to choose treatments for her own body." AMA Board of Trustees Factsheet on H. R. 1122 (June 1997), in App. to Brief for Association of American Physicians and Surgeons et al. as *Amici Curiae* 1. Thirty States have concurred with this view.

Although the description of this procedure set forth above should be sufficient to demonstrate the resemblance between the partial birth abortion procedure and infanticide, the testimony of one nurse who observed a partial birth abortion procedure makes the point even more vividly:

"The baby's little fingers were clasping and unclasping, and his little feet were kicking. Then the doctor stuck the scissors in the back of his head, and the baby's arms jerked out, like a startle reaction, like a flinch, like a baby does when he thinks he is going to fall.

"The doctor opened up the scissors, stuck a high-powered suction tube into the opening, and sucked the baby's brains out. Now the baby went completely limp." H. R. 1833 Hearing 18 (statement of Brenda Pratt Shafer).

The question whether States have a legitimate interest in banning the procedure does not require additional authority. See *ante,* at 961–964 (KENNEDY, J., dissenting).[18] In a civi-

---

[18] I read the majority opinion to concede, if only implicitly, that the State has a legitimate interest in banning this dehumanizing procedure. The threshold question under *Casey* is whether the abortion regulation serves a legitimate state interest. 505 U. S. 833 (1992). Only if the statute serves a legitimate state interest is it necessary to consider whether the regulation imposes a substantial obstacle to women seeking an abortion. *Ibid.* The fact that the majority considers whether Nebraska's statute creates a substantial obstacle suggests that the Members of the majority other than JUSTICE STEVENS and JUSTICE GINSBURG have rejected respondent's threshold argument that the statute serves no legitimate state purpose.

lized society, the answer is too obvious, and the contrary arguments too offensive, to merit further discussion. But see *ante,* at 946–947 (STEVENS, J., concurring) (arguing that the decision of 30 States to ban the partial birth abortion procedure was "simply irrational" because other forms of abortion were "equally gruesome"); *ante,* at 951–952 (GINSBURG, J., concurring) (similar).[19]

---

[19] JUSTICE GINSBURG seems to suggest that even if the Nebraska statute does not impose an undue burden on women seeking abortions, the statute is unconstitutional because it has the *purpose* of imposing an undue burden. JUSTICE GINSBURG's view is, apparently, that we can presume an unconstitutional purpose because the regulation is not designed to save any fetus from "destruction" or protect the health of pregnant women and so must, therefore, be designed to "chip away at . . . *Roe.*" *Ante,* at 952. This is a strange claim to make with respect to legislation that was enacted in 30 individual States and was enacted in Nebraska by a vote of 45 to 1, Nebraska Legislative Journal, 95th Leg., 1st Sess., 2609 (1997). Moreover, in support of her assertion that the Nebraska Legislature acted with an unconstitutional purpose, JUSTICE GINSBURG is apparently unable to muster a single shred of evidence that the Nebraska legislation was enacted to prevent women from obtaining abortions (a purpose to which it would be entirely ineffective), let alone the kind of persuasive proof we would require before concluding that a legislature acted with an unconstitutional intent. In fact, as far as I can tell, JUSTICE GINSBURG's views regarding the motives of the Nebraska Legislature derive from the views of a dissenting Court of Appeals judge discussing the motives of legislators of other States. JUSTICE GINSBURG's presumption is, in addition, squarely inconsistent with *Casey,* which stated that States may enact legislation to "express profound respect for the life of the unborn," 505 U. S., at 877, and with our opinion in *Mazurek* v. *Armstrong,* 520 U. S. 968 (1997) *(per curiam),* in which we stated:

"[E]ven assuming . . . that a legislative *purpose* to interfere with the constitutionally protected right to abortion without the *effect* of interfering with that right . . . could render the Montana law invalid—there is no basis for finding a vitiating legislative purpose here. We do not assume unconstitutional legislative intent even when statutes produce harmful results, see, *e. g., Washington* v. *Davis,* 426 U. S. 229, 246 (1976); much less do we assume it when the results are harmless." *Id.,* at 972 (emphases in original).

## C

The next question, therefore, is whether the Nebraska statute is unconstitutional because it does not contain an exception that would allow use of the procedure whenever " ' "necessary, in appropriate medical judgment, for the preservation of the . . . health of the mother." ' " *Ante,* at 930 (majority opinion) (quoting *Casey,* 505 U. S., at 879, in turn quoting *Roe,* 410 U. S., at 164–165) (emphasis deleted). According to the majority, such a health exception is required here because there is a "division of opinion among some medical experts over whether D&X is generally safer [than D&E], and an absence of controlled medical studies that would help answer these medical questions." *Ante,* at 936–937. In other words, unless a State can conclusively establish that an abortion procedure is no safer than other procedures, the State cannot regulate that procedure without including a health exception. JUSTICE O'CONNOR agrees. *Ante,* at 947–948 (concurring opinion). The rule set forth by the majority and JUSTICE O'CONNOR dramatically expands on our prior abortion cases and threatens to undo *any* state regulation of abortion procedures.

The majority and JUSTICE O'CONNOR suggest that their rule is dictated by a straightforward application of *Roe* and *Casey. Ante,* at 929–930 (majority opinion); *ante,* at 947–948 (O'CONNOR, J., concurring). But that is simply not true. In *Roe* and *Casey,* the Court stated that the State may "regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Roe, supra,* at 165; *Casey,* 505 U. S., at 879. *Casey* said that a health exception must be available if *"continuing her pregnancy* would constitute a threat" to the woman. *Id.,* at 880 (majority opinion) (emphasis added). Under these cases, if a State seeks to prohibit abortion, even if only temporarily or under particular circumstances, as *Casey* says that it may, *id.,* at 879 (plu-

rality opinion), the State must make an exception for cases in which the life or health of the mother is endangered by continuing the pregnancy. These cases addressed only the situation in which a woman must obtain an abortion because of some threat to her health from continued pregnancy. But *Roe* and *Casey* say nothing at all about cases in which a physician considers one prohibited method of abortion to be preferable to permissible methods. Today's majority and JUSTICE O'CONNOR twist *Roe* and *Casey* to apply to the situation in which a woman desires—for whatever reason—an abortion and wishes to obtain the abortion by some particular method. See *ante*, at 929–931 (majority opinion); *ante*, at 947–948 (concurring opinion). In other words, the majority and JUSTICE O'CONNOR fail to distinguish between cases in which health concerns require a woman to obtain an abortion and cases in which health concerns cause a woman who desires an abortion (for whatever reason) to prefer one method over another.

It is clear that the Court's understanding of when a health exception is required is not mandated by our prior cases. In fact, we have, post-*Casey*, approved regulations of methods of conducting abortion despite the lack of a health exception. *Mazurek* v. *Armstrong*, 520 U. S. 968, 971 (1997) *(per curiam)* (reversing Court of Appeals holding that plaintiffs challenging requirement that only physicians perform abortions had a "'fair chance of success'"); *id.*, at 979 (STEVENS, J., dissenting) (arguing that the regulation was designed to make abortion more difficult). And one can think of vast bodies of law regulating abortion that are valid, one would hope, despite the lack of health exceptions. For example, physicians are presumably prohibited from using abortifacients that have not been approved by the Food and Drug Administration even if some physicians reasonably believe

that these abortifacients would be safer for women than existing abortifacients.[20]

The majority effectively concedes that *Casey* provides no support for its broad health exception rule by relying on pre-*Casey* authority, see *ante*, at 931, including a case that was specifically disapproved of in *Casey* for giving too little weight to the State's interest in fetal life. See *Casey, supra*, at 869, 882 (overruling the parts of *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S. 747 (1986), that were "inconsistent with *Roe*'s statement that the State has a legitimate interest in promoting the life or potential life of the unborn," 505 U. S., at 870); *id.*, at 893 (majority opinion) (relying on *Thornburgh, supra*, at 783 (Burger, C. J., dissenting), for the proposition that the Court was expanding on *Roe* in that case). Indeed, JUSTICE O'CONNOR, who joins the Court's opinion, was on the Court for *Thornburgh* and was in dissent, arguing that, under the undue-burden standard, the statute at issue was constitutional. See 476 U. S., at 828–832 (arguing that the challenged state statute was not "unduly burdensome"). The majority's resort to this case proves my point that the holding today assumes that the standard set forth in the *Casey* joint opinion is no longer governing.

And even if I were to assume that the pre-*Casey* standards govern, the cases cited by the majority provide no support for the proposition that the partial birth abortion ban must

---

[20] As I discuss below, the only question after *Casey* is whether a ban on partial birth abortion without a health exception imposes an "undue burden" on a woman seeking an abortion, meaning that it creates a "substantial obstacle" for the woman. I assume that the Court does not discuss the health risks with respect to undue burden, and instead suggests that health risks are relevant to the necessity of a health exception, because a marginal increase in safety risk for some women is clearly not an undue burden within the meaning of *Casey*. At bottom, the majority is using the health exception language to water down *Casey*'s undue-burden standard.

include a health exception because some doctors believe that partial birth abortion is safer. In *Thornburgh, Danforth,* and *Doe,* the Court addressed health exceptions for cases in which *continued pregnancy* would pose a risk to the woman. *Thornburgh, supra,* at 770; *Planned Parenthood of Central Mo.* v. *Danforth,* 428 U. S. 52 (1976); *Doe* v. *Bolton,* 410 U. S., at 197.. And in *Colautti* v. *Franklin,* 439 U. S. 379 (1979), the Court explicitly declined to address whether a State can constitutionally require a tradeoff between the woman's health and that of the fetus. The broad rule articulated by the majority and by JUSTICE O'CONNOR are unprecedented expansions of this Court's already expansive pre-*Casey* jurisprudence.

As if this state of affairs were not bad enough, the majority expands the health exception rule articulated in *Casey* in one additional and equally pernicious way. Although *Roe* and *Casey* mandated a health exception for cases in which abortion is "necessary" for a woman's health, the majority concludes that a procedure is "necessary" if it has any comparative health benefits. *Ante,* at 937. In other words, according to the majority, so long as a doctor can point to support in the profession for his (or the woman's) preferred procedure, it is "necessary" and the physician is entitled to perform it. *Ibid.* See also *ante,* at 952 (GINSBURG, J., concurring) (arguing that a State cannot constitutionally "sto[p] a woman from choosing the procedure her doctor 'reasonably believes'" is in her best interest). But such a health exception requirement eviscerates *Casey*'s undue-burden standard and imposes unfettered abortion on demand. The exception entirely swallows the rule. In effect, no regulation of abortion procedures is permitted because there will always be *some* support for a procedure and there will always be some doctors who conclude that the procedure is preferable. If Nebraska reenacts its partial birth abortion ban with a health exception, the State will not be able to prevent physicians like Dr. Carhart from using partial birth abortion as a routine abortion procedure. This Court has now expressed

its own conclusion that there is "highly plausible" support for the view that partial birth abortion is safer, which, in the majority's view, means that the procedure is therefore "necessary." *Ante*, at 937. Any doctor who wishes to perform such a procedure under the new statute will be able to do so with impunity. Therefore, JUSTICE O'CONNOR's assurance that the constitutional failings of Nebraska's statute can be easily fixed, *ante*, at 950–951, is illusory. The majority's insistence on a health exception is a fig leaf barely covering its hostility to any abortion regulation by the States—a hostility that *Casey* purported to reject.[21]

### D

The majority assiduously avoids addressing the *actual* standard articulated in *Casey*—whether prohibiting partial birth abortion without a health exception poses a substantial obstacle to obtaining an abortion. 505 U. S., at 877. And for good reason: Such an obstacle does not exist. There are two essential reasons why the Court cannot identify a substantial obstacle. First, the Court cannot identify any real, much less substantial, barrier to any woman's ability to obtain an abortion. And second, the Court cannot demonstrate that any such obstacle would affect a sufficient number of women to justify invalidating the statute on its face.

### 1

The *Casey* joint opinion makes clear that the Court should not strike down state regulations of abortion based on the

---

[21] The majority's conclusion that health exceptions are required whenever there is any support for use of a procedure is particularly troubling because the majority does not indicate whether an exception for physical health only is required, or whether the exception would have to account for "all factors—physical, emotional, psychological, familial, and the woman's age—relevant to the well being of the patient." *Doe* v. *Bolton*, 410 U. S. 179, 192 (1973). See also *Voinovich* v. *Women's Medical Professional Corp.*, 523 U. S. 1036, 1037 (1998) (THOMAS, J., joined by REHNQUIST, C. J., and SCALIA, J., dissenting from denial of certiorari).

fact that some women might face a marginally higher health risk from the regulation. In *Casey*, the Court upheld a 24-hour waiting period even though the Court credited evidence that for some women the delay would, in practice, be much longer than 24 hours, and even though it was undisputed that any delay in obtaining an abortion would impose additional health risks. *Id.*, at 887; *id.*, at 937 (Blackmun, J., concurring in part, concurring in judgment in part, and dissenting in part) ("The District Court found that the mandatory 24-hour delay could lead to delays in excess of 24 hours, thus increasing health risks"). Although some women would be able to avoid the waiting period because of a "medical emergency," the medical emergency exception in the statute was limited to those women for whom delay would create "serious risk of substantial and irreversible impairment of a major bodily function." *Id.*, at 902 (appendix to joint opinion) (internal quotation marks omitted). Without question, there were women for whom the regulation would impose some additional health risk who would not fall within the medical emergency exception. The Court concluded, despite the certainty of this increased risk, that there was no showing that the burden on any of the women was substantial. *Id.*, at 887.

The only case in which this Court has overturned a State's attempt to prohibit a particular form of abortion also demonstrates that a marginal increase in health risks is not sufficient to create an undue burden. In *Planned Parenthood of Central Mo.* v. *Danforth*, 428 U. S. 52 (1976), the Court struck down a state regulation because the State had outlawed the method of abortion used in 70% of abortions and because alternative methods were, the Court emphasized, "significantly more dangerous and critical" than the prohibited method. *Id.*, at 76.

Like the *Casey* 24-hour waiting period, and in contrast to the situation in *Danforth*, any increased health risk to women imposed by the partial birth abortion ban is minimal

at most.   Of the 5.5% of abortions that occur after 15 weeks (the time after which a partial birth abortion would be possible), the vast majority are performed with a D&E or induction procedure.   And, for any woman with a vertex presentation fetus, the vertex presentation form of intact D&E, which presumably shares some of the health benefits of the partial birth abortion procedure but is not covered by the Nebraska statute, is available.   Of the remaining women— that is, those women for whom a partial birth abortion procedure would be considered and who have a breech presentation fetus—there is no showing that any one faces a significant health risk from the partial birth abortion ban.   A select committee of ACOG "could identify no circumstances under which this procedure . . . would be the only option to save the life or preserve the health of the woman."   App. 600 (ACOG Executive Board, Statement on Intact Dilation and Extraction (Jan. 12, 1997)).   See also *Hope Clinic* v. *Ryan,* 195 F. 3d 857, 872 (CA7 1999) (en banc) (" 'There does not appear to be any identified situation in which intact D&X is the only appropriate procedure to induce abortion' " (quoting Late Term Pregnancy Techniques, AMA Policy H-5.982 W. D. Wis. 1999)); *Planned Parenthood of Wis.* v. *Doyle,* 44 F. Supp. 2d, at 980 (citing testimony of Dr. Haskell that "the D&X procedure is never medically necessary to . . . preserve the health of a woman"), vacated, 195 F. 3d 857 (CA7 1999).   And, an ad hoc coalition of doctors, including former Surgeon General Koop, concluded that there are no medical conditions that require use of the partial birth abortion procedure to preserve the mother's health.   See App. 719.

In fact, there was evidence before the Nebraska Legislature that partial birth abortion *increases* health risks relative to other procedures.   During floor debates, a proponent of the Nebraska legislation read from and cited several articles by physicians concluding that partial birth abortion procedures are risky.   App. in Nos. 98–3245, 98–3300 (CA8),

p. 812.    One doctor testifying before a committee of the Nebraska Legislature stated that partial birth abortion involves three "very risky procedures": dilation of the cervix, using instruments blindly, and conversion of the fetus.    App. 721 (quoting testimony of Paul Hays, M. D.).[22]

There was also evidence before Congress that partial birth abortion "does not meet medical standards set by ACOG nor has it been adequately proven to be safe nor efficacious." H. R. 1833 Hearing 112 (statement of Nancy G. Romer, M. D.); see *id.*, at 110–111.[23]    The AMA supported the congressional ban on partial birth abortion, concluding that the procedure is "not medically indicated" and "not good medicine."    See 143 Cong. Rec. S4670 (May 19, 1997) (reprinting a letter from the AMA to Sen. Santorum).    And there was evidence before Congress that there is "certainly no basis upon which to state the claim that [partial birth abortion] is a safer or even a preferred procedure."    Partial Birth Abortion: The Truth, S. 6 and H. R. 929 Joint Hearing 123 (statement of Curtis Cook, M. D.).    This same doctor testified that

---

[22] Use of the procedure may increase the risk of complications, including cervical incompetence, because it requires greater dilation of the cervix than other forms of abortion.    See Epner, Jonas, & Seckinger, Late-term Abortion, 280 JAMA 724, 726 (Aug. 26, 1998).    Physicians have also suggested that the procedure may pose a greater risk of infection.    See *Planned Parenthood* of *Wis.* v. *Doyle*, 44 F. Supp. 2d 975, 979 (WD Wis. 1999).    See also Sprang & Neerhof, Rationale for Banning Abortions Late in Pregnancy, 280 JAMA 744 (Aug. 26, 1998) ("Intact D&X poses serious medical risks to the mother").

[23] Nebraska was entitled to rely on testimony and evidence presented to Congress and to other state legislatures.    Cf. *Erie* v. *Pap's A. M.*, 529 U. S. 277, 296–297 (2000); *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41, 51 (1986).    At numerous points during the legislative debates, various members of the Nebraska Legislature made clear that that body was aware of, and relying on, evidence before Congress and other legislative bodies.    See App. in Nos. 98–3245, 98–3300 (CA8), pp. 846, 852–853, 878–879, 890–891, 912–913.

"partial-birth abortion is an unnecessary, unsteady, and potentially dangerous procedure," and that "safe alternatives are in existence." *Id.,* at 122.

The majority justifies its result by asserting that a "significant body of medical opinion" supports the view that partial birth abortion may be a safer abortion procedure. *Ante,* at 937. I find this assertion puzzling. If there is a "significant body of medical opinion" supporting this procedure, no one in the majority has identified it. In fact, it is uncontested that although this procedure has been used since at least 1992, no formal studies have compared partial birth abortion with other procedures. 11 F. Supp. 2d, at 1112 (citing testimony of Dr. Stubblefield); *id.,* at 1115 (citing testimony of Dr. Boehm); Epner, Jonas, & Seckinger, Late-term Abortion, 280 JAMA 724 (Aug. 26, 1998); Sprang & Neerhof, Rationale for Banning Abortion Late in Pregnancy, 280 JAMA 744 (Aug. 26, 1998). Cf. *Kumho Tire Co.* v. *Carmichael,* 526 U. S. 137, 149–152 (1999) (observing that the reliability of a scientific technique may turn on whether the technique can be and has been tested; whether it has been subjected to peer review and publication; and whether there is a high rate of error or standards controlling its operation). The majority's conclusion makes sense only if the undue-burden standard is not whether a "significant body of medical opinion" supports the result, but rather, as JUSTICE GINSBURG candidly admits, whether *any* doctor could reasonably believe that the partial birth abortion procedure would best protect the woman. *Ante,* at 952.

Moreover, even if I were to assume credible evidence on both sides of the debate, that fact should resolve the undue-burden question in favor of allowing Nebraska to legislate. Where no one knows whether a regulation of abortion poses any burden at all, the burden surely does not amount to a "substantial obstacle." Under *Casey,* in such a case we should defer to the legislative judgment. We have said:

"[I]t is precisely where such disagreement exists that legislatures have been afforded the widest latitude in drafting such statutes. . . . [W]hen a legislature undertakes to act in areas fraught with medical and scientific uncertainties, legislative options must be especially broad . . . ." *Kansas* v. *Hendricks,* 521 U. S., at 360, n. 3 (internal quotations marks omitted).

In JUSTICE O'CONNOR's words:

"It is . . . difficult to believe that this Court, without the resources available to those bodies entrusted with making legislative choices, believes itself competent to make these inquiries and to revise these standards every time the American College of Obstetricians and Gynecologists (ACOG) or similar group revises its views about what is and what is not appropriate medical procedure in this area." *Akron* v. *Akron Center for Reproductive Health, Inc.,* 462 U. S., at 456 (dissenting opinion).

See *id.,* at 456, n. 4 ("Irrespective of the difficulty of the task, legislatures, with their superior factfinding capabilities, are certainly better able to make the necessary judgments than are courts"); *Webster* v. *Reproductive Health Services,* 492 U. S., at 519 (plurality opinion) (Court should not sit as an "*ex officio* medical board with powers to approve or disapprove medical and operative practices and standards throughout the United States (internal quotations marks omitted)); *Jones* v. *United States,* 463 U. S. 354, 365, n. 13 (1983) ("The lesson we have drawn is not that government may not act in the face of this [medical] uncertainty, but rather that courts should pay particular deference to reasonable legislative judgments"). The Court today disregards these principles and the clear import of *Casey.*

2

Even if I were willing to assume that the partial birth method of abortion is safer for some small set of women, such

a conclusion would not require invalidating the Act, because this case comes to us on a facial challenge. The only question before us is whether respondent has shown that "'no set of circumstances exists under which the Act would be valid.'" *Ohio* v. *Akron Center for Reproductive Health,* 497 U. S. 502, 514 (1990) (quoting *Webster* v. *Reproductive Health Services, supra,* at 524 (O'CONNOR, J., concurring in part and concurring in judgment)). Courts may not invalidate on its face a state statute regulating abortion "based upon a worst-case analysis that may never occur." 497 U. S., at 514.

Invalidation of the statute would be improper even assuming that *Casey* rejected this standard *sub silentio* (at least so far as abortion cases are concerned) in favor of a so-called "'large fraction'" test. See *Fargo Women's Health Organization* v. *Schafer,* 507 U. S. 1013, 1014 (1993) (O'CONNOR, J., joined by SOUTER, J., concurring) (arguing that the "no set of circumstances" standard is incompatible with *Casey).* See also *Janklow* v. *Planned Parenthood, Sioux Falls Clinic,* 517 U. S. 1174, 1177–1179 (1996) (SCALIA, J., dissenting from denial of certiorari). In *Casey,* the Court was presented with a facial challenge to, among other provisions, a spousal notice requirement. The question, according to the majority, was whether the spousal notice provision operated as a "substantial obstacle" to the women "whose conduct it affects," namely, "married women seeking abortions who do not wish to notify their husbands of their intentions and who do not qualify for one of the statutory exceptions to the notice requirement." 505 U. S., at 895. The Court determined that a "large fraction" of the women in this category were victims of psychological or physical abuse. *Ibid.* For this subset of women, according to the Court, the provision would pose a substantial obstacle to the ability to obtain an abortion because their husbands could exercise an effective veto over their decision. *Id.,* at 897.

None of the opinions supporting the majority so much as mentions the large fraction standard, undoubtedly because

the Nebraska statute easily survives it. I will assume, for the sake of discussion, that the category of women whose conduct Nebraska's partial birth abortion statute might affect includes any woman who wishes to obtain a safe abortion after 16 weeks' gestation. I will also assume (although I doubt it is true) that, of these women, every one would be willing to use the partial birth abortion procedure if so advised by her doctor. Indisputably, there is no "large fraction" of these women who would face a substantial obstacle to obtaining a safe abortion because of their inability to use this particular procedure. In fact, it is not clear that *any* woman would be deprived of a safe abortion by her inability to obtain a partial birth abortion. More medically sophisticated minds than ours have searched and failed to identify a single circumstance (let alone a large fraction) in which partial birth abortion is required. But no matter. The "ad hoc nullification" machine is back at full throttle. See *Thornburgh* v. *American College of Obstetricians and Gynecologists*, 476 U. S., at 814 (O'CONNOR, J., dissenting); *Madsen* v. *Women's Health Center, Inc.*, 512 U. S. 753, 785 (1994) (SCALIA, J., concurring in judgment in part and dissenting in part).

\* \* \*

We were reassured repeatedly in *Casey* that not all regulations of abortion are unwarranted and that the States may express profound respect for fetal life. Under *Casey*, the regulation before us today should easily pass constitutional muster. But the Court's abortion jurisprudence is a particularly virulent strain of constitutional exegesis. And so today we are told that 30 States are prohibited from banning one rarely used form of abortion that they believe to border on infanticide. It is clear that the Constitution does not compel this result.

I respectfully dissent.